IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

DENIM NORTH AMERICA HOLDINGS,         *
LLC,
                                      *
        Plaintiff,
                                      *
vs.                                           CASE NO. 4:10-CV-45 (CDL)
                                      *
SWIFT TEXTILES, LLC, GALEY &
LORD, LLC, and PATRIARCH              *
PARTNERS, LLC,
                                      *
        Defendants.

———————————————————————

O R D E R

This action arises from a dispute between Plaintiff, Denim North America Holdings, LLC ("Holdings"), and Defendants, Swift Textiles, LLC ("Swift"), Galey & Lord, LLC ("Galey"), and Patriarch Partners, LLC ("Patriarch"). These parties entered into a business venture to manufacture and sell denim textile products through a limited liability company, Denim North America, LLC ("DNA"). DNA was jointly owned and controlled by Holdings and Swift. Holdings alleges that Defendants fraudulently induced it into the venture and subsequently breached contracts and fiduciary duties relating to that business relationship.

Presently pending before the Court is Defendants' Motion to Dismiss (ECF No. 7). All Defendants contend that Holdings's Complaint fails to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Patriarch also maintains that the Complaint

should be dismissed for lack of personal jurisdiction over it pursuant to Federal Rule of Civil Procedure 12(b)(2). For the following reasons, the Court denies Patriarch's motion to dismiss for lack of personal jurisdiction and grants Defendants' motion to dismiss the following claims: (1) Holdings's breach of fiduciary duty claim against Patriarch and Galey; (2) Holdings's breach of contract claim against Swift and Galey; and (3) Holdings's claim arising under O.C.G.A. § 14-11-307. The following claims remain pending: (1) fraudulent inducement against Swift, Galey, and Patriarch; (2) breach of fiduciary duty against Swift; (3) rescission; and (4) punitive damages.

FACTUAL ALLEGATIONS

Holdings alleges the following. Prior to 2006, John Pezold and George Jeter owned DNA, which operated a denim manufacturing facility located at 1 Marubeni Drive in Columbus, Georgia (the "Marubeni Drive Facility"). DNA was profitable but operating at less than full capacity. In 2006, John Heldrich, a Galey executive, contacted DNA and proposed a joint venture among DNA, Swift, Galey, and Patriarch. Swift is owned by Galey (collectively, "Swift Galey"). Swift Galey is owned by Patriarch.[1]

---

[1]*See* Compl. ¶ 3. The Court recognizes that Patriarch produced evidence that it does not directly own Swift or Galey as part of its Rule 12(b)(2) motion to dismiss. Defs.' Mot. to Dismiss Ex. 4, Owen Aff. ¶¶ 11-12, May 7, 2010, ECF No. 7-5. In analyzing Defendants' Rule 12(b)(6) motion to dismiss, however, the Court accepts as true all facts set forth

After Heldrich's initial contact, Patriarch took over negotiations of the venture on behalf of all three Defendants. In June 2006, DNA representatives Tracy Sayers, Larry Galbraith, and Monte Galbraith accepted Defendants' invitation to travel to Patriarch's Offices in New York to meet and discuss a joint venture (the "New York Meeting"). Present at the New York Meeting on behalf of Patriarch were Lynn Tilton, Larry Himes, and Patriarch's counsel. Present on behalf of Swift Galey were John Heldrich, James Murray, and Al Blalock. Patriarch's Tilton, however, controlled the negotiations and every detail of the transaction was subject to Tilton's approval.

At the New York Meeting, Patriarch's Tilton and Himes made various representations about how DNA would financially benefit through a joint venture with Defendants. Patriarch represented that Swift Galey had a sales program with customer contacts in the international denim industry and a "world class" sales support department. Patriarch proposed that Swift Galey's sales, marketing, development, technical service, and customer service capabilities could be combined with DNA's Marubeni Drive Facility to significantly increase the volume of DNA's sales and corresponding profit margin. Patriarch represented that if DNA would exclusively manufacture

---

in Holdings's Complaint. Fed. R. Civ. P. 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).

premium quality denim at its Marubeni Drive Facility, then Swift Galey would use its manufacturing facilities in China and Mexico to produce lower-grade denim.[2] The premium denim and lower-grade denim could then be combined to offer a mixed product base that would be more attractive to customers. Patriarch represented that this arrangement would result in increased efficiency and higher margins for DNA.

In return for DNA's agreement to exclusively manufacture premium grade denim, Patriarch represented that Swift Galey would hire DNA's sales force and use its exclusive efforts to sell DNA's denim. Patriarch further represented that Swift Galey would produce enough customer orders to enable DNA to operate its Marubeni Drive Facility at full capacity, twenty-four hours a day, seven days a week. To meet this demand, Patriarch represented that DNA would need to: (1) hire and train additional employees to run the Marubeni Drive Facility at full capacity; and (2) purchase 110 faster and more efficient Picanol weaving machines from Swift Galey.

At the end of the New York Meeting, and in reliance on Defendants' representations, the parties reached an agreement about the future operation of DNA. Pezold and Jeter formed Holdings as part of an agreement with Defendants for Holdings and Swift to

---

[2]Prior to the business venture with Defendants, DNA's Marubeni Drive Facility produced a variety of grade of denim.

jointly own and manage DNA. In September 2006, Swift, Galey, Holdings, and DNA entered into a subscription agreement ("Subscription Agreement") under which Swift took a 50% ownership interest in and became a member of DNA and Holdings remained a 50% owner and member of DNA. *See generally*, Defs.' Mem. in Supp. of Mot. to Dismiss [hereinafter Defs.' Mot. to Dismiss] Ex. 1, Subscription Agreement, ECF No. 7-2 [hereinafter Subscription Agreement]. In consideration for its ownership interest, Swift made a capital contribution to DNA. *Id.* §§ 1.01-1.02; Defs.' Mot. to Dismiss Ex. 2, Operating Agreement Ex. A, Schedule of Capital Contributions 46, ECF No. 7-3 [hereinafter Schedule of Capital Contributions]. Holdings also made a capital contribution to purchase the Picanol weaving machines from Swift Galey. Schedule of Capital Contributions. Subsequently, Holdings, Swift, and DNA entered into an operating agreement ("Operating Agreement") to govern the management of DNA. *See generally*, Defs.' Mot. to Dismiss Ex. 2, Operating Agreement, ECF No. 7-3 [hereinafter Operating Agreement]. The Operating Agreement provides that DNA shall be run by a board of eight managers, four appointed by Swift and four appointed by Holdings. *Id.* § 2.02. Finally, Swift, Galey, and DNA entered into a manufacturing and supply agreement ("Manufacturing Agreement") under which DNA agreed to exclusively manufacture premium grade denim and Swift agreed to exclusively sell DNA's denim. Defs.' Mot. to Dismiss Ex. 3,

Manufacturing & Supply Agreement, ECF No. 7-4 [hereinafter Manufacturing Agreement].[3]

In accordance with the agreements, DNA removed and sold its existing weaving machines, purchased and installed the Picanol weaving machines, hired and trained additional employees, and converted its Marubeni Drive Facility to full capacity; thus enabling it to exclusively produce premium quality denim at the higher volumes contemplated by the parties. Swift Galey, however, never produced the volume of customer orders that Patriarch represented it would. Instead, twelve months into the joint operation of DNA, and after DNA had operated the Marubeni Drive Facility at full capacity, twenty-four hours a day, seven days a week, for five months, Swift Galey terminated its sales force and abandoned its obligations to DNA. Holdings was forced to rehire DNA's sales staff, terminate the additional employees DNA hired to operate the Marubeni Drive Facility at full capacity, and finance the operation of DNA on its own. Holdings also discovered that Patriarch had concealed ten million yards of warehoused denim inventory which Swift Galey sold for its own benefit after the joint operation of DNA had begun.

---

[3] Even though the Subscription Agreement, Operating Agreement, and Manufacturing Agreement were not attached to Holdings's Complaint, the Court may consider them in deciding Defendants' motion to dismiss because Holdings refers to all three agreements in its Complaint and they are integral to the claims presented. *Curtis Inv. Co. v. Bayerische Hypo-und Vereinsbank, AG*, 341 F. App'x 487, 492 n.2 (11th Cir. 2009) (per curiam); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

DNA and Holdings filed the present action alleging: (1) fraudulent inducement against Swift, Galey, and Patriarch; (2) breach of fiduciary duty against Swift, Galey, and Patriarch; (3) breach of contract against Swift and Galey; (4) rescission; (5) breach of duties owed by members of a Georgia limited liability company ("LLC") pursuant to O.C.G.A. § 14-11-307 against Swift; and (6) punitive damages. The Court previously dismissed DNA as a Plaintiff in this action. *See Denim North America Holdings, LLC v. Swift Textiles, LLC*, No. 4:10-CV-45 (CDL), 2011 WL 97238, at *3-*4 (M.D. Ga. Jan. 12, 2011). All three Defendants now seek dismissal of Holdings's Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Patriarch also contends that it should be dismissed for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

## DISCUSSION

## I. Defendants' Rule 12(b)(2) Motion to Dismiss

Patriarch maintains that the Court lacks personal jurisdiction over it and that it should be dismissed from this action pursuant to Rule 12(b)(2). Because "[a] court without personal jurisdiction is powerless to take further action," the Court will decide this jurisdictional issue first. *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999) (per curiam) (court should decide

personal jurisdiction before considering a motion to dismiss for failure to state a claim).

### A. Rule 12(b)(2) Motion to Dismiss Standard

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (internal quotation marks omitted). "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.* (internal quotation marks omitted). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Id.* (internal quotation marks omitted).

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Id.* at 1257-58.

B. The Georgia Long-Arm Statute

In Georgia, the long-arm statute is not coextensive with procedural due process. The Georgia Long-Arm Statute imposes jurisdictional requirements that are independent of the constitutional requirements of procedural due process. *Id.* at 1259. One prong of Georgia's Long-Arm Statute authorizes jurisdiction where a plaintiff's cause of action "arises out of" a nonresident defendant's "transact[ion] of any business within [Georgia]." O.C.G.A. § 9-10-91(1).[4] As explained by the Eleventh Circuit Court of Appeals, courts "must interpret this statute literally and give full effect to the breadth of its language." *Diamond Crystal Brands, Inc.*, 593 F.3d at 1264 (citing *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa*, 279 Ga. 672, 620 S.E.2d 352 (2005)). "Interpreted literally, 'transacts any business' requires that the 'nonresident defendant has purposefully done some act or consummated some transaction in [Georgia] . . . .'" *Id.* (quoting *Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515, 517, 631 S.E.2d 734, 737 (2006)). "That said, a defendant need not physically enter the state. As a result, a nonresident's mail, telephone calls,

---

[4]Holdings also contends that Patriarch satisfies the Georgia Long-Arm Statute because it committed tortious acts in Georgia and regularly conducts business in Georgia through a partnership. Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss 8-9, ECF No. 8 [hereinafter Pl.'s Resp.]; *see* O.C.G.A. § 9-10-91(2)-(3). Because the Court finds that Patriarch satisfies the "transacting business" prong of the Georgia Long-Arm Statute, the Court need not address any other basis for long-arm jurisdiction.

and other 'intangible' acts, though occurring while the defendant is physically outside of Georgia, must be considered." *Id.* (citing *Innovative Clinical*, 279 Ga. at 675-76, 620 S.E.2d at 355-56); *Paxton v. Citizens Bank & Trust of West Georgia*, No. A10A1255, 2010 WL 4751753, at *3 (Ga. App. Nov. 24, 2010)("Georgia allows the assertion of long-arm jurisdiction over [nonresident defendants based on] business conducted through postal, telephonic, and Internet contacts." (internal quotation marks omitted)). Accordingly, the Court must "examine all of [Patriarch's] tangible and intangible conduct and ask whether it can fairly be said that [Patriarch] has transacted any business within Georgia." *Id.*

Here, Holdings has alleged sufficient facts to establish a prima facie case that Patriarch transacted business in Georgia. Notice of Removal Ex. A, Compl. ¶¶ 18-26, ECF No. 1-2. Patriarch challenges jurisdiction with an affidavit asserting that Patriarch does not transact business in Georgia. *See generally*, Defs.' Mot. to Dismiss Ex. 4, Owen Aff., May 7, 2010, ECF No. 7-5 [hereinafter Owen Aff.]. Patriarch asserts that it does not own Swift or Galey, that Patriarch employees involved in DNA management do so on Swift Galey's behalf, and that various other entities, not Patriarch, actually engaged in transactions in Georgia that Holdings attributes to Patriarch. Defs.' Mot. to Dismiss 11, 16, 18-19; Owen Aff. ¶¶ 2-19; Defs.' Reply Mem. in Supp. of Mot. to Dismiss 4-5, ECF No. 13 [hereinafter Defs.'

Reply.].  Patriarch has produced some evidence that it does not directly own Swift Galey.  Owen Aff. ¶¶ 11-12.  Patriarch is also correct, as a general matter, that even if it did own Swift Galey, Swift Galey's transaction of business in Georgia would not necessarily be attributed to Patriarch.  *See, e.g.*, *Yukon Partners, Inc. v. Lodge Keeper Grp., Inc.*, 258 Ga. App. 1, 5-6, 572 S.E.2d 647, 651-52 (2002) (finding, pre-*Innovative Clinical*, that an affiliate's contacts with Georgia were insufficient to assert personal jurisdiction over a separate entity under the transacting business prong of the Georgia Long-Arm Statute).

Notwithstanding Patriarch's protestations to the contrary, the Court finds that Holdings has established for jurisdictional purposes that Patriarch directly transacted business in Georgia.  First, Patriarch, through agents, sought out and solicited DNA in Georgia to join Swift Galey in the joint operation of DNA.  *See* Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss [hereinafter Pl.'s Resp.] Ex. C, Sayers Aff. [hereinafter Sayers Aff.] Ex. B, Email from J. Murray to T. Sayers, June, 23, 2006, ECF No. 8-5.  The unsolicited initiation of a business relationship with a Georgia company, even through an intermediary, can satisfy the transacting business prong of the Georgia Long-Arm Statute.  *See Diamond Crystal Brands, Inc.*, 593 F.3d at 1265 (finding that a court may consider purchase orders sent through an intermediary to a Georgia company in the "transacts any

11

business" equation); O.C.G.A. § 9-10-91(1) (stating that a Georgia court may exercise personal jurisdiction over any nonresident who "in person *or through an agent* . . . [t]ransacts any business within this state." (emphasis added)).  Holdings also produced evidence that Patriarch directly participated in and effectively controlled the negotiations of the Holdings-Swift Galey joint operation of DNA, part of which occurred in Georgia.  *See* Sayers Aff. ¶¶ 8-18, 23 (stating Patriarch controlled negotiation and that Patriarch employee traveled to Atlanta, Georgia to finalize and close the transaction); Sayers Aff. Ex. B, Multiple Emails Between R. Annas of Patriarch & DNA Employees, hand-numbered pages 2-7, ECF No. 8-5 (negotiating transaction through emails sent to DNA employees in Columbus, Georgia).  Finally, Holdings has produced evidence that Patriarch directly controlled the Swift Galey interest in DNA, a Georgia LLC. *See* Sayers Aff. ¶ 18 ("Patriarch was completely in control on the Swift side of the operation of DNA[.]"); *see also id.* ¶¶ 6, 17, 26, 30-32; Sayers Aff. Ex. B, Multiple Emails Between R. Annas & M. Benson of Patriarch & DNA Employees, hand-numbered pages 8-28, ECF No. 8-5 (discussing DNA operational issues through emails sent to DNA employees in Columbus, Georgia).  Given Patriarch's direct and substantial involvement in the solicitation, negotiation, and operation of the Holdings-Swift Galey joint operation of DNA, and construing all reasonable inferences in Holdings's favor, the Court

12

finds that Patriarch transacted business in the state of Georgia such that the requirements of the Georgia Long-Arm Statute have been satisfied. *Diamond Crystal Brands, Inc.*, 593 F.3d at 1263 & n.15 (instructing courts to construe O.C.G.A. § 9-10-91(1) according to the facts of each case and stating that "[w]hether the nonresident defendant '[t]ransacts any business within this state' is the sole touchstone of long-arm jurisdiction.").

C. Patriarch Has Minimum Contacts with Georgia

Having found that Georgia's Long-Arm Statute permits jurisdiction, the Court must determine whether the exercise of jurisdiction over Patriarch under the circumstances of this case comports with the Due Process Clause of the Fourteenth Amendment. "[T]he Due Process Clause requires 'that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there.'" *Diamond Crystal Brands, Inc.*, 593 F.3d at 1267 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "Therefore, states may exercise jurisdiction over only those who have established 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

In this case, "the 'fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* (quoting *Burger King*, 471 U.S. at 472-73). "Put differently, the defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation." *Id.* "Once this showing is made, a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.*

In its opposition to jurisdiction, Patriarch has submitted the affidavit of a Patriarch employee who enumerates various ways Patriarch is not present in Georgia. *See generally* Owen Aff.; *see also* Defs.' Mot. to Dismiss 19-20; Defs.' Reply 6-7. As the Court has previously found, Holdings has produced evidence that Patriarch was directly and substantially involved in the solicitation, negotiation, and operation of the Holdings-Swift Galey joint operation of DNA in Georgia. Given that evidence, and construing all reasonable inferences in Holdings's favor, the Court finds that Patriarch has purposefully availed itself of the privilege of conducting business in Georgia. Further, it is undisputed that this

action arises from the Holdings-Swift Galey joint operation of DNA. Therefore, the Court finds that Patriarch purposefully established sufficient minimum contacts with Georgia such that Patriarch reasonably should have anticipated defending suit here.

"In addition to minimum contacts, the exercise of jurisdiction must also comport with traditional notions of fair play and substantial justice." *Diamond Crystal Brands, Inc.*, 593 F.3d at 1274. To make this determination, the Court must evaluate several factors: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies." *Id.* (internal quotation marks omitted). Here, Patriarch has presented no argument, and certainly not the requisite "compelling case," that exercising jurisdiction would be unconstitutionally unfair. Since Georgia's interest in exercising jurisdiction often justifies even "serious burdens" on a nonresident defendant, plainly it justifies jurisdiction here. *Id.*

In summary, the Court finds that Patriarch's connections to this forum satisfy the requirements of the Georgia Long-Arm Statute and the Due Process Clause of the Fourteenth Amendment. Therefore, to

the extent Defendants' motion to dismiss seeks dismissal of Patriarch pursuant to Rule 12(b)(2), that motion is denied.

## II. Defendants' Rule 12(b)(6) Motion to Dismiss

Defendants also argue that Holdings's Complaint fails to state a claim and should be dismissed in its entirety pursuant to Rule 12(b)(6).

### A. Rule 12(b)(6) Motion to Dismiss Standard

When considering a 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in the plaintiff's complaint and limit its consideration to the pleadings and exhibits attached thereto. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do[.]" *Id.* Although the complaint must contain factual allegations that "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims, *id.* at 556, "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it

strikes a savvy judge that actual proof of those facts is improbable,'" *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly,* 550 U.S. at 556). Applying this standard, the Court examines each of Holdings's claims.

B. Breach of Fiduciary Duty

Under Georgia law, "a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Ansley Marine Constr., Inc. v. Swanberg*, 290 Ga. App. 388, 391, 660 S.E.2d 6, 9 (2008). Defendants contend that Holdings's fiduciary duty allegations fail to state a claim because: (1) Holdings fails to sufficiently allege facts supporting a fiduciary relationship between Holdings and any of the Defendants; and (2) Holdings fails to allege a breach. The Court addresses each contention in turn.

1. *Fiduciary Duty*

Defendants first argue that Holdings's claims for breach of fiduciary duty fail because no partnership was formed between Holdings and Defendants and, therefore, no Defendant owed Holdings any fiduciary duty arising from an alleged partnership. The Court agrees. In Georgia, "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit." O.C.G.A. § 14-8-6(a). "But any association formed under any other

17

statute of this state . . . is not a partnership." O.C.G.A. § 14-8-6(b). This includes an association formed under the Georgia Limited Liability Company Act. O.C.G.A. § 14-11-100, *et seq*.

Although Holdings now contends that it formed a partnership with Swift, Galey, and Patriarch to operate DNA, the Operating Agreement and Subscription Agreement, which Holdings references in its Complaint, directly contradict this assertion. They establish that DNA was formally organized as a limited liability company under the Georgia Limited Liability Company Act with Holdings and Swift as its only members. *See* Operating Agreement § 13.02; Subscription Agreement ¶ 1. Thus, it is clear from the Complaint that DNA is a Georgia limited liability company and that the relationship between Holdings and Defendants arises from its status as a member of DNA and not as a partner in a separate partnership. O.C.G.A. § 14-8-6(b). Moreover, since neither Patriarch nor Galey were members of DNA, they have no relationship with Holdings that would give rise to a breach of fiduciary duty claim. Accordingly, Holdings's claims for breach of fiduciary duty against Patriarch and Galey are dismissed. Holdings fiduciary duty claim against Swift, however, requires additional discussion.

Swift and Holdings are both members of DNA. A managing member of a limited liability company does owe a fiduciary duty to its fellow members. O.C.G.A. § 14-11-305(1) ("In managing the business

18

or affairs of a limited liability company[, a] member or manager shall act in a manner he or she believes in good faith to be in the best interests of the limited liability company[.]"); *accord ULQ, LLC v. Meder*, 293 Ga. App. 176, 184, 666 S.E.2d 713, 720 (2008). Swift argues that it owes Holdings no fiduciary duty in connection with DNA because it contends that it was a "non-managing" member of DNA. Defs.' Mot. to Dismiss 22-23. Swift is correct that "a person who is a member of a limited liability company in which management is vested in one or more managers, *and who is not a manager*, shall have no duties to the limited liability company or to the other members solely by reason of acting in his or her capacity as a member." O.C.G.A. § 14-11-305(1); *accord Meder*, 293 Ga. App. at 184-85, 666 S.E.2d at 720-21. The Court, however, finds that Plaintiff has sufficiently alleged that Swift was a *managing* member of DNA and therefore, owed a fiduciary duty to Holdings.

According to the Operating Agreement, DNA is managed by its members through a board of eight managers. Operating Agreement §§ 2.01-2.02. Four managers are appointed by Holdings, and four are appointed by Swift. *Id.* No manager is permitted to take any action unless the action has been approved by at least a majority of the managers. *Id.* Therefore, it is reasonable to conclude from

Holdings's Complaint that Swift actively managed DNA.  Consequently, a fiduciary relationship existed between Holdings and Swift.[5]

### 2.  Breach & Damages

Swift also contends that Holdings's claim for breach of fiduciary duty fails because it did not allege that Swift breached any duties other than those arising out of written agreements. Defs.' Mot. to Dismiss 23-25.  Swift relies upon the general principle that "mere failure to perform a contract does not constitute a tort," including breach of fiduciary duty. *ServiceMaster Co., L.P. v. Martin*, 252 Ga. App. 751, 754, 556 S.E.2d 517, 521 (2001).  To sue for breach of fiduciary duty, "the defendant must also breach an *independent* duty created by statute or common law" and "the plaintiff must have an independent injury over and above the mere disappointment of plaintiff's hope to receive the contracted-for benefit."  *Brock Built, LLC v. Blake*, 300 Ga. App. 816, 824, 686 S.E.2d 425, 432 (2009) (internal quotation marks omitted).

Here, Holdings alleges that Swift breached fiduciary duties it owed Holdings as a co-member of DNA by: (1) "making fraudulent misrepresentations and fraudulently concealing material facts in the

---

[5]The Court observes that Swift's contention that it did not manage DNA is somewhat disingenuous given that its argument in support of its motion to dismiss DNA as a party in this action, which the Court accepted, was based upon the fact that the Swift-appointed managers had not approved the filing of the action by DNA.

operation of" DNA, Compl. ¶¶ 123-24;[6] (2) usurping LLC opportunities
and engaging in a conflict of interest transaction when it concealed
millions of yards of warehoused denim and subsequently sold that
inventory for its sole benefit after the start of the Holdings-Swift
joint operation of DNA, *id.* ¶¶ 125-28; and (3) closing its China and
Mexico manufacturing facilities and terminating DNA's sales staff
shortly after the start of the Holdings-Swift joint operation of DNA,
*id.* ¶¶ 129-32.  Although Holdings's last two allegations above do
relate to Swift's obligations under the Manufacturing Agreement, the
Court finds that this does not prevent it from asserting a fiduciary
duty claim.  Defs.' Mot. to Dismiss 24-25; Manufacturing Agreement §
2.1(a) (requiring Swift to purchase all U.S.-sourced denim it sells
from DNA); *id.* § 2.1(b) (requiring Swift to purchase all other denim
sold during the first 36 months of the agreement from specified
sources).  Swift had a duty to "act in a manner [it] believes in good
faith to be in the best interests of the limited liability company."
O.C.G.A. § 14-11-305(a).  That duty was in addition to any
contractual duty.  Moreover, it is important to note that Holdings
was not a party to the Manufacturing Agreement.  *See generally,*

---

[6]Although not entirely clear from Holdings's Complaint, to the extent
Holdings alleges Swift breached fiduciary duties based on conduct that
occurred prior to the joint Holdings-Swift operation of DNA, the Court
finds that such a claim fails as a matter of law.  As the Court explained
above, the only fiduciary duties Swift owed Holdings arose from their
relationship as members of DNA.

Manufacturing Agreement (executed by DNA, Swift, and Galey). Therefore, the breach of fiduciary duty Holdings's alleges cannot be asserted by Holdings as a breach of contract claim. Thus, the Court finds that Holdings's breach of fiduciary duties claim is not restricted to contractual duties arising out of the written agreements. It is a separate and independent claim distinct from any disappointment in not receiving a contracted-for benefit. Furthermore, Holdings has alleged that Swift's breach "undermined the partnership" and caused Holdings to "essentially ha[ve] to take over operation of [DNA] with no assistance from" Swift. Compl. ¶¶ 130-31.

The Court finds that Holdings has alleged that Swift owed fiduciary duties to Holdings, breached those duties, and caused damage to Holdings beyond mere disappointment in not receiving a contracted-for benefit. Accordingly, to the extent Defendants' motion to dismiss seeks dismissal of Holdings's claim for breach of fiduciary duty against Swift, that motion is denied.

C.   Breach of Contract

Holdings alleges that Swift and Galey breached the Manufacturing Agreement and the Subscription Agreement. Compl. ¶¶ 145-60. Defendants seek dismissal of these claims. Regarding the Manufacturing Agreement, Holdings was not a party to that contract. *See generally* Manufacturing Agreement (executed between DNA, Swift,

22

and Galey).  Therefore, it has no claim for the alleged breach of a contract to which it was not even a party.[7]

Holdings was a party to the Subscription Agreement, but it has failed to allege sufficiently how that agreement was breached by Defendants.  Holdings generally alleges a breach of the implied "duty of good faith and fair dealing" arising from Defendants' alleged fraudulent inducement of Plaintiff to enter into the contract. Compl. ¶¶ 147-48.  The Court finds this allegation confusing.  "[I]t is well-settled [in Georgia] that the implied duty of good faith does not stand independent of the terms of the underlying contract." *Med. S. Health Plans, LLC v. Life of S. Ins. Co.*, No. 4:07-CV-134(CDL), 2008 WL 2119915, at *5 (M.D. Ga. May 19, 2008); *see also Stuart Enters. Int'l, Inc. v. Peykan, Inc.*, 252 Ga. App. 231, 234, 555 S.E.2d 881, 884 (2001) ("[T]he covenant [of good faith and fair dealing] is not independent of the contract.").  Holdings points to no allegations that connect the duty of good faith and fair dealing to the contract itself.  It seems to allege that the duty of good faith and fair dealing was breached because of Defendants' fraud inducing Holdings to enter into the contract in the first place. These allegations may support a fraudulent inducement claim but they

---

[7]The Court observes that its ruling does not foreclose the possibility that Holdings may be able to assert a derivative claim as a member of DNA based upon the breach of a contract to which DNA was a party.  *See Denim North America Holdings, LLC*, 2011 WL 97238, at *3 & n.2.  Holdings, however, does not allege a derivative claim in the present action.

do not state a claim for breach of contract. The Court finds that Holdings has not alleged facts sufficient to state a claim for breach of the Subscription Agreement.

### D. Fraud

Holdings alleges that it was fraudulently induced to enter into a partnership with Defendants, including its entry into the Subscription Agreement and the Operating Agreement. The Court has previously found that Plaintiff has failed to allege sufficient facts to support its claim that a partnership existed among the parties. Therefore, the remaining issues regarding the fraudulent inducement claim relate to the Subscription Agreement and Operating Agreement. Defendants maintain that Holdings's fraud allegations fail to state a claim because: (1) Holdings failed to plead facts sufficient to support its fraud claim and failed to plead such facts with the requisite specificity; (2) Holdings affirmed the Subscription Agreement and Operating Agreement, and therefore, the merger provisions in those agreements estop Holdings from bringing a fraud claim; and (3) the alleged misrepresentations are not actionable because they concern future projections and events. The Court addresses each contention in turn.

#### 1. *Failure to Plead Facts Sufficient to Support Fraud*

Defendants first contend that Holdings's Complaint fails to state an actionable claim for fraud because the facts pled by

Holdings are insufficient to state a claim for fraud and because they are not sufficiently specific under Federal Rule of Civil Procedure 9(b). To state a claim for fraudulent inducement under Georgia law, a plaintiff must plead: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *Argentum Int'l, LLC v. Woods*, 280 Ga. App. 440, 443, 634 S.E.2d 195, 200 (2006) (internal quotation marks omitted). In addition to alleging the essential elements of a fraud claim, "a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This "heightened" pleading requirement "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation marks omitted). Of course, Rule 9(b) "must not abrogate the concept of notice pleading." *Id.* (internal quotation marks omitted). A proper balance between notice pleading and the specificity required by Rule 9(b) is struck when the complaint alleges:

> (1) precisely what statements were made in what documents
> or oral representations or what omissions were made, and
> (2) the time and place of each such statement and the
> person responsible for making (or, in the case of
> omissions, not making) same, and (3) the content of such
> statements and the manner in which they misled the
> plaintiff, and (4) what the defendants obtained as a
> consequence of the fraud.

*Id.* (internal quotation marks omitted).

Holdings's fraudulent inducement claims are based on: (1) Defendants' alleged misrepresentation that Swift would produce a very large volume of customer orders [the "Sales Projections" claim]; and (2) Defendants' alleged misrepresentation that Swift would exclusively sell denim produced by DNA and the related allegation that Defendants concealed millions of yards of warehoused denim and subsequently sold that inventory for their sole benefit after the start of the Holdings-Swift joint operation of DNA [the "Exclusive Efforts and Concealment" claim]. For the following reasons, the Court finds that Holdings has sufficiently alleged the essential elements of its fraud claims and that it has done so with the requisite particularity to comply with Rule 9(b). The Court will first address the essential elements of the claim followed by the Rule 9(b) analysis.

Holdings alleges that Patriarch, through its agents Tilton and Himes, made a false misrepresentation by affirmatively representing at the June 2006 New York Meeting that Swift would produce sufficient

customer orders such that DNA would need to convert its Marubeni Drive Facility to full capacity, hire and train additional employees, and purchase 100 Picanol weaving machines from Swift. Compl. ¶¶ 27, 30, 43-50. Holdings alleges that Swift and Galey, through their agents James Murray, John Heldrich, and Al Blalock, affirmed and adopted Patriarch's representation. *Id.* ¶ 72, 76, 89-96. Holdings also alleges that Defendants supported their representation with fifteen months of written sales projections that were incorporated into the Subscription Agreement and Manufacturing Agreement.[8] *Id.* ¶¶ 32, 51-54, 78, 97-99. Holdings alleges that Defendants knew the representation was false and made the representation without an intention to perform. *Id.* ¶¶ 33, 47, 53, 55, 79, 93, 99-100. Holdings further alleges that this promise was made with the intention to induce Holdings into entering the Subscription Agreement and Operating Agreement, *id.* ¶¶ 33, 47, 79, 93, and that Holdings relied on Defendants' promise to produce the represented volume of customer orders when it entered into the Subscription Agreement and Operating Agreement, *id.* ¶¶ 39, 44, 56-57, 85, 90, 101-102. Finally, Holdings alleges that it suffered damages as a result of Defendants' fraud. *Id.* ¶¶ 49-50, 58, 95-96, 103. The Court finds that Holdings

---

[8]Holdings specifically alleged that Defendants projected sales of 1.275 million yards for the first quarter of 2006, producing $4,445,000 of revenue.

has sufficiently alleged each essential element of its "Sales Projections" fraud claim against Patriarch, Swift, and Galey.

Holdings also alleges that Patriarch, through its agents Tilton and Himes, made a false misrepresentation by affirmatively representing at the June 2006 New York Meeting and in the Manufacturing Agreement that Swift would use its exclusive efforts to sell DNA denim. Compl. ¶¶ 27, 30, 59. Again, Holdings alleges that Swift and Galey, through their agents James Murray, John Heldrich, and Al Blalock, affirmed and adopted Patriarch's representation. *Id.* ¶¶ 72, 76, 104. Holdings also makes a related allegation that Defendants concealed ten million yards of warehoused denim and subsequently sold that inventory for their sole benefit after the start of the Holdings-Swift Galey joint operation of DNA instead of using Swift's exclusive efforts to sell DNA denim. *Id.* ¶¶ 60-64, 105-108. Holdings alleges that Defendants both promised Swift would exclusively sell DNA denim and concealed the warehoused denim with the intention of inducing Holdings to enter into the Subscription Agreement and Operating Agreement. *Id.* ¶¶ 60, 63, 67, 105, 107, 111. Holdings further alleges that it relied on Defendants' promise that Swift would use its exclusive efforts to sell DNA denim when it entered into the Subscription Agreement and Operating Agreement, and that Holdings would not have entered into the Subscription Agreement or Operating Agreement had it known about the warehoused denim

28

Defendants allegedly concealed.  *Id.* ¶¶ 65-69, 109-113.  Finally, Holdings alleges that it suffered damages as a result of Defendants' purported fraud.  *Id.* ¶¶ 70, 115.  The Court finds that Holdings has sufficiently alleged each essential element of its "Exclusive Efforts and Concealment" fraud claim against Patriarch, Swift, and Galey.

Having found that Holdings has sufficiently alleged the essential elements of its fraud claims, the Court turns to whether those allegations were made with sufficient particularity to comply with Rule 9(b).  Holdings's fraud claims are based upon two specific representations, made by two named Patriarch agents, and adopted by three named Swift Galey agents, at the June 2006 New York Meeting, and subsequently memorialized in the Subscription Agreement and the Manufacturing Agreement.  Holdings also alleges concealment of ten million yards of warehoused denim by the same actors, at the same place, at the same time.  Finally, Holdings has alleged that Defendants' representations and omissions induced it to enter into the Subscription Agreement and Operating Agreement.  Defendants cannot reasonably complain that they are not on notice regarding (1) what statement was made or omitted; (2) in what document; (3) when the statement was made; (4) who made the statement; (5) the content of the statement; and (6) what defendant obtained as a result of the fraud.  *See Ziemba*, 256 F.3d at 1202.  "[F]air notice is [p]erhaps the most basic consideration underlying Rule 9(b)," *Brooks v. Blue*

*Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997) (per curiam) (internal quotation marks omitted), and the Complaint, along with the Subscription Agreement, Operating Agreement, and Manufacturing Agreement, are sufficient to provide Defendants with fair notice of Holdings's fraud claims. To the extent Defendants seek to dismiss Holdings's fraud claims for failure to comply with Federal Rule of Civil Procedure 9(b), Defendants' motion is denied.

### 2.   *Rescission & Effect of the Merger Clause*

Defendants next contend that the merger provisions in the Subscription Agreement and Operating Agreement preclude Holdings from asserting fraud claims based upon misrepresentations that were made prior to the consummation of those agreements. Defendants' argument is based on the premise that Holdings failed to rescind the Subscription Agreement or Operating Agreement and restore the consideration to Defendants, but instead affirmed the contracts. Therefore, Defendants maintain that Holdings is bound by the merger clauses.

An essential element of a claim for fraud is justifiable reliance by the plaintiff. *Argentum Int'l, LLC*, 280 Ga. App. at 443, 634 S.E.2d at 200. Thus, "'where the allegedly defrauded party affirms a contract which contains a merger or disclaimer provision and retains the benefits, he is estopped from asserting that he

relied upon the other party's misrepresentation and his action for fraud must fail.'" *Ekeledo v. Amporful*, 281 Ga. 817, 819, 642 S.E.2d 20, 22 (2007) (quoting *Authentic Architectural Millworks v. SCM Group USA*, 262 Ga. App. 826, 828, 586 S.E.2d 726, 729 (2003)). This is because a merger clause "operates as a disclaimer, establishing that the written agreement completely and comprehensively represents all the parties' agreement." *Authentic Architectural Millworks*, 262 Ga. App. at 828, 586 S.E.2d at 729 (internal quotation marks omitted). Therefore, typically "if the contract contains a merger clause, a party cannot argue they relied [upon] representations other than those contained in the contract." *Id.* (alteration in original) (internal quotation marks omitted). Here, however, the Court finds that the merger provisions in the Subscription Agreement and Operating Agreement do not preclude Holdings's fraudulent inducement claims as a matter of law because Holdings is seeking to rescind those agreements based on inceptive fraud and because Holdings's fraudulent inducement claims are based in part on the Subscription Agreement itself.

> a. Rescission of the Subscription Agreement and Operating Agreement

Holdings seeks rescission of the Subscription Agreement and Operating Agreement as remedies for its fraud claim. Compl. ¶¶ 133-44. "As a general rule, Georgia law requires a [party] seeking

31

rescission of a contract on the ground of fraud to restore or offer to restore the consideration therefore as a condition precedent to bringing the action." *Vivid Invs., Inc. v. Best Western Inn-Forsyth, Ltd.*, 991 F.2d 690, 692 (11th Cir. 1993). Further, Georgia law requires a plaintiff seeking rescission to do so "promptly." O.C.G.A. § 13-4-60. Generally, an attempt to seek rescission contemporaneously with the filing of a lawsuit is insufficiently prompt under Georgia law. *See, e.g.*, *Nexus Servs., Inc. v. Manning Tronics, Inc.*, 201 Ga. App. 255, 255, 410 S.E.2d 810, 811 (1991) (stating that "the rule requiring one who seeks the rescission of a contract on the ground of fraud to restore, or offer to restore, the consideration received, *as a condition precedent to bringing the action*, is settled in this State") (internal quotation marks omitted); *accord Megel v. Donaldson*, 288 Ga. App. 510, 515, 654 S.E.2d 656, 661 (2007).

Here, Holdings did not seek rescission of the Subscription Agreement or Operating Agreement before filing this lawsuit. Compl. ¶¶ 141-42. Georgia, however, recognizes an exception to the tender rule when tender would be impossible or unreasonable. *See, e.g.*, *Orion Capital Partners, L.P. v. Westinghouse Elec. Corp.*, 223 Ga. App. 539, 543, 478 S.E.2d 382, 385 (1996) (stating defrauded party "need not offer to restore where the defrauding party has made restoration impossible, or when to do so would be unreasonable").

32

Holdings alleges that rescinding the agreements and returning Defendants' consideration would be unreasonable or impossible and that it was made so by Defendants' wrongful conduct. Compl. ¶¶ 141-42. Therefore, the Court finds that "[a]t the very least, [Holdings] has raised factual issues concerning whether requiring tender would be reasonable under the circumstances." *Vivid Invs., Inc.*, 991 F.2d at 692-93 (applying Georgia law and finding that factual issues remained regarding whether tender was required when plaintiff argued that tender would constitute an abandonment of its investment). Based on the foregoing, the Court finds that Holdings has sufficiently alleged rescission as the appropriate remedy in this case for purposes of withstanding Defendants' motion to dismiss. Because Holdings is seeking to rescind the Subscription Agreement and Operating Agreement based on inceptive fraud, the merger provisions in those agreements do not defeat Holdings's claim of fraud in the inducement as a matter of law. *City Dodge, Inc. v. Gardner*, 232 Ga. 766, 770, 208 S.E.2d 794, 797-98 (1974) ("It is inconsistent to apply a disclaimer provision of a contract in a tort action brought to determine whether the entire contract is invalid because of alleged prior fraud which induced the execution of the contract. If the contract is invalid because of the antecedent fraud, then the disclaimer provision therein is ineffectual[.]"); *accord Crews v.*

*Cisco Bros. Ford-Mercury, Inc.*, 201 Ga. App. 589, 591, 411 S.E.2d 518, 520-21 (1991).

> b. Sales Projections Fraud Claim in the Subscription Agreement

As to Holdings's Sales Projections fraud claim arising from misrepresentations in the Subscription Agreement itself, the merger provision would not foreclose that claim because the misrepresentations are made contemporaneously with the merger clause within the same agreement. Holdings alleges that Swift and Galey incorporated the alleged misrepresentation that Swift would produce a very large volume of customer orders of DNA denim into the Subscription Agreement in the form of written sales projections. Subscription Agreement § 4.10. A merger clause will not preclude a fraud claim when a plaintiff "relie[s] upon misrepresentations in the contract itself[.]" *Authentic Architectural Millworks*, 262 Ga. App. at 828, 586 S.E.2d at 729; *see also Brock v. King*, 279 Ga. App. 335, 340, 629 S.E.2d 829, 834 (2006), *aff'd* 282 Ga. 56 (2007). Therefore, based on Holdings's allegations, the Subscription Agreement's merger provision does not preclude Holdings's Sales Projections fraud claim for the second independent reason that it is based on the Subscription Agreement itself.

### 3. Future Projections & Events

Finally, Defendants contend that Holdings's fraudulent inducement claims must be dismissed to the extent they relate to future projections or events. Defs.' Mot. to Dismiss 33-34. Defendants' contention is based on the principle that "[a]ctionable fraud does not result from a mere failure to perform promises made; otherwise, any breach of contract would amount to fraud." *Brock*, 279 Ga. App. at 339, 629 S.E.2d at 834. Georgia, however, recognizes an exception to this rule "where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place." *BTL COM Ltd., Co. v. Vachon*, 278 Ga. App. 256, 258, 628 S.E.2d 690, 694 (2006). Here, Holdings has alleged facts which, if true, could be found by the factfinder to support Holdings's claim that Defendants had no intent to honor their representations to Holdings and that Defendants knew their sales projections would not be achieved. Therefore, the Court finds that at the motion to dismiss stage, Holdings's fraudulent inducement claims do not fail as a matter of law.

Defendants also argue that the Subscription Agreement expressly disclaimed any promise that the sales projections provided would be achieved. Defs.' Mot. to Dismiss 31-32; Subscription Agreement § 4.10. As explained above, however, Holdings has stated a claim for rescission of the Subscription Agreement, so any disclaimer

provisions in that agreement do not preclude Holdings's fraudulent inducement claims as a matter of law.

### E. Claims Under O.C.G.A. § 14-11-307

Defendants also seek dismissal of Holdings's claim against Swift for breach of duty arising from O.C.G.A. § 14-11-307. Swift argues that the Operating Agreement expressly exempts DNA's members from that statutory section. Operating Agreement § 3.06 ("Official Code of Georgia Annotated § 14-11-307 shall not apply to the Company."). Section 14-11-307 expressly permits an LLC to opt out of its provisions. O.C.G.A. § 14-11-307(a). Therefore, to the extent the Operating Agreement survives Holdings's fraudulent inducement claim, the Operating Agreement's disclaimer precludes Holdings's claim under O.C.G.A. § 14-11-307. To the extent Holding's fraudulent inducement claim succeeds, the Operating Agreement would be rescinded, rendering Holdings's claim under O.C.G.A. § 14-11-307 moot. Accordingly, the Court grants Defendants' motion to dismiss as to Holdings's claim that Swift breached any duty arising from O.C.G.A. § 14-11-307.

### F. Punitive Damages

Finally, the Court's finding that Holdings has stated a claim for fraudulent inducement necessarily means in this case that Plaintiff has sufficiently alleged a claim for punitive damages. *Argentum Int'l, LLC*, 280 Ga. App. at 448, 634 S.E.2d at 203 ("[F]raud will support a punitive damages award.").

CONCLUSION

For the foregoing reasons, the Court finds it has personal jurisdiction over Patriarch and that Holdings has stated a claim for: (1) fraudulent inducement against Swift, Galey, and Patriarch; (2) breach of fiduciary duty against Swift; (3) rescission; and (4) punitive damages. The Court finds that Holdings has failed to state a claim for: (1) breach of fiduciary duty against Patriarch and Galey; (2) breach of contract against Swift and Galey; or (3) breach of duties arising from O.C.G.A. § 14-11-307 against Swift. Accordingly, Defendants' Motion to Dismiss (ECF No. 7) is granted in part and denied in part.

The stay in this action is hereby lifted. Defendants shall file their answer to Holdings's Complaint within 14 days of today's Order. The parties shall comply with the Court's Rule 16/26 Order which is also filed today as a separate order.


IT IS SO ORDERED, this 28th day of January, 2011.


S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE