IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

DENIM NORTH AMERICA HOLDINGS, *
LLC,
                                 *

     Plaintiff,
                                 *

vs.                              *          CASE NO. 4:10-CV-45 (CDL)
                                 *

SWIFT TEXTILES, LLC,
GALEY & LORD, LLC, and           *
PATRIARCH PARTNERS, LLC,
                                 *

     Defendants.
                                 *
_____  *

<u>O R D E R</u>

     This action arises from a dispute between Plaintiff Denim
North America Holdings, LLC ("Holdings" or "Plaintiff") and
Defendants Swift Textiles, LLC ("Swift"), Galey & Lord, LLC
("Galey"), and Patriarch Partners, LLC ("Patriarch")
(collectively, "Defendants").   Holdings and Defendants entered
into a business venture to manufacture and sell denim textile
products through a limited liability company called Denim North
America, LLC ("DNA").   DNA was jointly owned by Holdings and
Swift.   Holdings contends that Defendants fraudulently induced
it to enter the venture and then breached fiduciary duties
relating to that business relationship.

     Defendants filed three motions that are presently pending
before the Court.   First, Defendants contend that Holdings
destroyed certain email correspondence that is relevant to the

claims and defenses in this action.  Defendants assert that the destruction of the emails amounts to spoliation of evidence, and they seek dismissal of the Complaint as a sanction.  Defs.' Mot. to Dismiss or for an Adverse Inference Against Pl. for Spoliation of Evidence (ECF No. 42).   In the alternative, Defendants seek summary judgment as to all of Plaintiff's claims.  Defs.' Mot. for Summ. J. (ECF No. 40).  In support of their motion for summary judgment, Defendants ask the Court to draw an adverse inference regarding the destroyed emails and also move to strike an affidavit of Larry Galbraith based on its inconsistency with his prior deposition testimony and its failure to comply with Federal Rule of Evidence 1006 regarding summary or compilation evidence.  Defs.' Mot. to Strike (ECF No. 50).

For the reasons that follow, the Court finds that the emails were not destroyed in bad faith; therefore, Defendants' Motion to Dismiss or for an Adverse Inference Against Plaintiff for Spoliation of Evidence (ECF No. 42) is denied.  The Court finds that the affidavit of Larry Galbraith should not be stricken, so the Motion to Strike (ECF No. 50) is denied.  The Court finds that Defendants' Motion for Summary Judgment (ECF No. 40) should be granted in part and denied in part. Specifically, the Court finds that genuine factual disputes exist as to Plaintiff's claims for fraudulent inducement based

on Defendants' sales projections and for breach of fiduciary duty arising from Defendants' competition against Plaintiff and Defendants' termination of its sales staff. Therefore, Defendants' motion for summary judgment is denied as to those claims. The Court finds, however, that no genuine factual dispute exists as to Plaintiff's fraudulent inducement claim based on Defendants' concealment of Swift's financial condition or Plaintiff's breach of fiduciary duty claim arising from certain foreign ventures. Therefore, summary judgment is granted as to those claims.

The Court will first address Defendants' motion to dismiss for spoliation of evidence, followed by a discussion of Defendants' motion to strike and motion for summary judgment.

## MOTION TO DISMISS

Defendants seek dismissal of this action as a sanction for Plaintiff's destruction of emails Defendants contend are critical to the claims and defenses in this case. In the alternative, Defendants argue that an adverse inference should be drawn against Holdings in the consideration of Defendants' summary judgment motion based upon this alleged spoliation of evidence.

It is undisputed that Holdings does not have a document retention policy with respect to emails. It is also undisputed that Plaintiff's witnesses—Larry Galbraith, Monte Galbraith,

George Jeter, Jack Pezold and Tracy Sayers—each had a routine practice of deleting most emails within a short time of receiving them, rarely retained emails longer than three months, and only retained electronic or hard copies of emails if they thought the emails were important.  Finally, it is undisputed that Plaintiff's witnesses did not modify these processes after they reasonably anticipated this litigation in either 2007 or 2008.  As a result, Holdings was unable to produce these emails, which Defendants contend are potentially critical to Plaintiff's own case, during discovery.

Under Federal Rule of Civil Procedure 37, the Court may sanction a party for destroying evidence.  Federal law "governs the imposition of spoliation sanctions," though the Court's determination is also informed by Georgia law.  *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).  In determining the proper sanction for spoliation, the Court must consider "(1) whether the defendant was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; [and] (4) whether the plaintiff acted in good or bad faith."[1]  *Id.* at 945.  In general, an adverse inference is drawn from a party's failure to preserve evidence "'only when the absence of that

_____

[1] It is undisputed that the fifth *Flury* factor—"the potential for abuse if expert testimony about the evidence was not excluded"—is not at issue here.

evidence is predicated on bad faith.'" *Cox v. Target Corp.*, 351 F. App'x 381, 383 (11th Cir. 2009) (per curiam) (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (per curiam)). Also, under Federal Rule of Civil Procedure 37(e), "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Fed. R. Civ. P. 37(e).

The present record supports a finding that Holdings' employees destroyed the emails in the ordinary course of business unmotivated by any bad faith. *E.g.,* Defs.' Mot. to Dismiss 3 nn.6 & 7 (summarizing testimony of Plaintiff's witnesses, who generally stated that they had a regular practice of deleting emails unless they thought they would need to refer to them later). Defendants have produced no evidence to the contrary. Accordingly, the Court finds that sanctions are not appropriate. Therefore, Defendants' Motion to Dismiss or in the Alternative Apply an Adverse Inference (ECF No. 42) is denied.

## MOTION TO STRIKE

In opposition to Defendants' motion for summary judgment, Plaintiff relies upon the third affidavit of Larry Galbraith ("Galbraith Affidavit"). Defendants seek to strike that affidavit. Defs.' Mot. to Strike 3rd Galbraith Aff., ECF No.

50.    Therefore, the Court must decide Defendants' Motion to Strike (ECF No. 50) before addressing Defendant's Motion for Summary Judgment.

In his third affidavit, Galbraith included a report that is an assimilation of DNA sales invoices and differentiates between sales of higher margin and lower margin denim products. Pl.'s Resp. to Defs.' Mot. for Summ. J. [hereinafter Pl.'s Resp.] Ex. 44, Galbraith 3d Aff. ¶ 4, ECF No. 44-44 [hereinafter Galbraith Aff.]. The purpose of this report is to demonstrate that Swift produced a significantly lower sales volume of higher margin denim product than it projected over the first five quarters of the joint venture and that the overall sales volume was mainly lower margin denim product.

The following background explains the importance of this affidavit. DNA sold two main types of denim during the first five quarters of the joint venture: Swift styles, which were higher margin products, and DNA styles, which were lower margin products. Holdings contends that it suffered damages because Defendants did not market the Swift styles as they promised to do, so the bulk of product DNA manufactured and sold during the first five quarters of the joint venture was the lower priced

DNA style denim.[2]   Although Swift maintained inventory records that tracked inventory by style and by buyer, those records were lost due to a power outage.   It is undisputed that Holdings representative Larry Galbraith testified at his deposition that DNA's records did not distinguish between sales of higher margin Swift denim and lower margin DNA denim.   Defendants relied on that testimony in their summary judgment motion, arguing that Holdings had produced no evidence that distinguished between sales of higher margin Swift denim and lower margin DNA denim.

Defendants cannot seriously dispute, however, that, prior to Galbraith's 30(b)(6) deposition, Holdings produced to Defendants the sales records that Galbraith later used to produce the Affidavit.  *See* Pl.'s Resp. to Defs.' Mot. to Strike Ex. A, Letter from M. Mullin to H. Richard 2, Apr. 14, 2011, ECF No. 51-1 (notifying Defendants that DNA had "thousands and thousands of invoices and other documentary details of product sold" dating back to 2006 and offering Defendants an opportunity to review them).   It is undisputed that Defendants did not review those documents.

Defendants contend that the Court should strike the Galbraith Affidavit for two reasons: (1) Galbraith was not prepared for his deposition as the 30(b)(6) corporate

---

[2]  DNA has dramatically reduced the amount of Swift style denim it produces, and the vast majority of its production is now focused on DNA styles.  Galbraith Aff. ¶ 13 & Ex. B.

representative of Holdings; and (2) the Galbraith Affidavit does not meet the requirements of Federal Rule of Evidence 1006 for summary exhibits.  Neither contention is persuasive.

It is undisputed that Galbraith was one of Plaintiff's 30(b)(6) corporate representatives on the topic of damages. L. Galbraith Dep. 24:1-11, ECF No. 59.  At his deposition, Galbraith explained that although DNA's quarterly reports did not differentiate between sales of Swift style product and sales of DNA style denim after 2006, *id.* at 99:21-100:11, he also stated that he could go back and reconstruct it and "break it down by style," *id.* at 119:13-22.  After the deposition, that is what Galbraith did.  Galbraith Aff. ¶ 4.

Assuming that Larry Galbraith was not adequately prepared for his 30(b)(6) deposition on this sales issue, the Court finds that his alleged lack of preparation does not justify striking the Affidavit.  Defendants' complaints of prejudice attributable to Galbraith's lack of preparation lose their sympathetic appeal when one considers that Holdings had previously produced (or agreed to make available) the underlying evidence—the sales records—that formed the basis for the Affidavit.  The Court does not diminish the importance of complying with Federal Rule of Evidence 1006, which requires that the evidence underlying summary exhibits be identified. Under the circumstances here, however, the Court finds that any

non-compliance does not warrant the serious sanction of disregarding the evidence altogether. Accordingly, the Court declines to strike the Affidavit on this basis.

Prior to trial, Holdings must strictly comply with Federal Rule of Evidence 1006. Within seven days of today's Order, Holdings shall specifically identify which documents are supportive of the testimony provided in Galbraith's Affidavit and shall permit Defendants to inspect those documents prior to the pretrial conference in this case. Moreover, if Defendants chose to do so, they shall be permitted to continue the deposition of Larry Galbraith prior to trial to examine him on the issues raised by this summary evidence.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual

dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following.  Unless otherwise noted, the facts are undisputed.

## I.   **Defendants' Background**

Swift is the denim manufacturing division of Galey, a twill manufacturer.  Galey was purchased with investment funds managed by Patriarch.  Lynn Tilton is CEO of Patriarch, and she is also the sole member of Galey.

By 2006, Swift had closed all but one of its U.S. denim production facilities, and Swift's only U.S.-based denim production facility was its Boland plant in Columbus, Georgia. The Boland plant produced approximately 30 dye-shades of premium denim and 200 to 250 styles.  These styles were considered innovative, unique, and difficult to make.  Swift sold its denim to premier customers for an average price of $3.50 per yard. Swift, however, determined that it could no longer operate the Boland plant at a profit, and it decided to reduce or eliminate its U.S. production footprint.  At the time, Swift was in a joint venture in Mexico called Swift Denim Hidalgo that produced lower priced denim.  Swift also had plans to build a new denim

facility in China as part of a joint venture with Lucky Textiles.

Prior to the DNA joint venture, Swift had liquidity problems and declining sales. *E.g.,* Pl.'s Resp. Ex. 9, Email from R. Annas to L. Tilton, Mar. 12, 2006, ECF No. 44-9; *Id.* Ex. 13, Email from J. Murray to J. Heldrich, July 6, 2006, ECF No. 44-13. Swift sought additional funding from Patriarch but was told to start looking for other sources of cash. *Id.* Ex. 12, Email from L. Tilton to L. Himes, June 19, 2006, ECF No. 44-12.

Defendants believed that it would be risky to close the Boland plant without having another way to produce its high quality denim. *E.g.,* *id.* 44-15, Email from R. Annas to L. Tilton, ECF No. 44-15 at 1-2 (stating that closing Boland "would wreck" some of Swift's customers and that Swift Denim Hidalgo was not yet capable of making the Boland products). Defendants believed that a possible solution to this problem would be to enter a joint venture with DNA. Under Defendants' plan, Swift would contribute equipment but no cash, and if the joint venture lost steam, Swift "would simply walk away." *Id.* Ex. 16, Email from R. Annas to L. Tilton, May 26, 2006, ECF No. 44-16 at 1.

## II.  DNA's Background

DNA manufactures denim in Columbus, Georgia. Prior to the joint venture, DNA had a capacity of approximately 20 million yards of denim per year. In 2006, DNA produced approximately 14

million yards of denim.  DNA did not produce as many dye-shades or styles as Swift produced at the Boland plant, and DNA's denim sold at a lower price than Swift's.

Before the joint venture between Holdings and Swift, DNA's principals were George Jeter and John Pezold.  Jeter and Pezold are the principals of Holdings.  Pezold owns Pezold Management Associates ("Pemanco"), which operates numerous businesses in Columbus.  Tracy Sayers is a longtime employee of Pemanco, and during the relevant timeframe he served as an executive vice president.  Larry Galbraith is president and CEO of DNA, and by 2006 he had 30 years of experience in the denim industry.

## III. The Negotiations

In May of 2006, John Heldrich, who was then CEO of Swift, called Larry Galbraith about a possible business transaction between Swift and DNA.  After that phone call, there were several meetings that included Heldrich of Swift, Jim Murray of Galey, and Larry Galbraith, Monte Galbraith and Tracy Sayers of DNA.  Tilton did not attend those initial meetings.

In June of 2006, the parties met in New York for two days to negotiate an agreement.  The meeting included Heldrich, Murray, Sayers and Larry Galbraith.  Al Blalock and Larry Himes of Swift also attended.  Tilton attended portions of the meeting.  Patriarch's Robert Annas attended the meeting but did not participate in the negotiations.  The essential terms of the

deal were negotiated by Sayers on behalf of DNA and Tilton and Himes on behalf of Swift, Galey, and Patriarch.  *E.g.*, Sayers Dep. 288:11-290:8, ECF No. 53.  The parties memorialized in a term sheet the terms agreed upon during the June 2006 meeting. Negotiations continued after that meeting.  *Id.* 290:22-291:18. The term sheet was executed by Sayers on behalf of Holdings and Heldrich on behalf of Swift.  No one from Patriarch signed the term sheet.

## IV.  **The Deal**

After the parties executed the term sheet, they negotiated the deal documents, including a Subscription Agreement, a Manufacturing and Supply Agreement and an Operating Agreement. Both sides were represented by counsel during the negotiations, and the final deal documents were executed in September 2006.

During the negotiations, Holdings requested that Swift provide certain financial information before the execution of the transaction documents.  Also, under the Subscription Agreement, Swift agreed to provide its financial records upon request.  Defs.' Statement of Undisputed Material Facts [hereinafter Defs.' SMF] Ex. 13, Subscription Agreement § 4.04, ECF No. 41-13 at 28 [hereinafter Subscription Agreement].  Swift refused these requests, telling Holdings that the financial statements were not ready.  Holdings executed the transaction

documents without receiving the financial statements. *E.g.,* Sayers Dep. 248:4-14.

The goal of the deal was to transition some of Swift's 30 million yards of denim sales at higher prices to DNA's facility—pushing out DNA's lower margin sales—and to run DNA's facility at full capacity, manufacturing approximately 20 million yards of denim per year. Under the terms of the Subscription Agreement, Swift Purchased a 50% interest in DNA, and the other half of DNA was owned by Holdings. Swift was to move its denim production into the DNA plant and sell the denim produced by DNA.

As a result of the deal, Swift and Holdings each became members of DNA. The Operating Agreement provided that DNA would be managed by a board of eight managers. Defs.' SMF Ex. 14, Operating Agreement §§ 2.01 & 2.02, ECF No. 41-14 at 12 [hereinafter Operating Agreement]. Four of the managers are appointed by Swift, and four are appointed by DNA. *Id.* § 2.02. In the event of a vacancy, Swift appoints replacements for Swift-appointed managers, and Holdings appoints replacements for Holdings-appointed managers. *Id.* § 2.10, ECF No. 41-14 at 15-16. No manager is permitted to take any action unless the action has been approved by at least a majority of the managers. *Id.* § 2.01, ECF No. 41-14 at 12.

Swift contributed 110 Picanol looms, which the parties valued at $2.35 million.[3]   Swift also had two deemed contributions for volume and mix enhancements, and those contributions together were valued at $4.88 million.   The mix enhancement was a credit to Swift for bringing higher-margin customers to DNA, and the volume enhancement was a credit for the additional volume of sales Swift would bring to DNA.   It is undisputed that the mix and volume enhancements were a significant part of Swift's consideration for the deal.[4]   *C.f.,* Defs.' SMF Ex. 24, Email from J. Murray to T. Sayers ¶ 13, Aug. 9, 2009, ECF No. 41-24 at 4 (acknowledging that Swift's $4.88 million credit had to be "earned through future performance").  Holdings contributed DNA's balance sheet, as well as a deemed efficiency enhancement, which was a credit for DNA's ability to manufacture denim at a lower cost.

The Manufacturing Agreement required DNA to pay 3% of its gross sales to Swift as "its reasonable share of Swift's costs associated with world-wide Product sales, marketing,

---

[3]  According to Holdings, Defendants pushed the Picanol looms on Holdings, insisting that DNA needed the looms to make the Swift products.  L. Galbraith Dep. 126:7-13.  According to Larry Galbraith, however, the looms were not necessary because they did not bring any new capability to DNA.  *Id.* at 126:15-18; *accord* Pl.'s Resp. Ex. 34, Email from T. Driver to B. George, May 21, 2008, ECF NO. 44-34.

[4]  Defendants point out that Swift was entitled to a "Preferred Distribution" only if Swift met certain earnings and price-per-yard targets.  Operating Agreement § 6.06(b), ECF No. 14-14 at 26.  It is undisputed that Swift did not meet the requirements for such a distribution.  There is no evidence that Swift had to meet such requirements to receive regular dividends.

merchandising, customer technical support, and Product direction/development, and samples." Defs.' SMF Ex. 15, Manufacturing Agreement § 3.2, ECF No. 41-15 at 3 [hereinafter Manufacturing Agreement].

## V. The Transition

Before the transaction closed, DNA's operational and marketing personnel discussed the transition with Swift's operational and marketing personnel. In one meeting, DNA's Monte Galbraith met with Swift's Rick Waide to discuss what products DNA would sell. Swift planned to transition thirty-five styles from the Boland facility to DNA's facility. Later, that number was revised downward to approximately twenty-seven styles. Monte Galbraith did not help Swift put together sales forecasts or projections of what products would be sold. M. Galbraith Dep. 114:10-115:1, ECF No. 61. Under the transition plan, Monte Galbraith became a managing director of Swift's jeanswear division. The Swift jeanswear sales force, which was a blended team of Swift and DNA personnel, reported to Monte Galbraith, who in turn reported to Waide. *Id.* at 49:10-50:12. Waide handled "wrapping up the Boland side of the business," while Monte Galbraith, working closely with Waide, focused the day-to-day operations. *Id.* at 50:8-22, 59:8-20. DNA's sales force was responsible for selling denim produced at the DNA facility in Columbus, as well as the denim produced at Swift

Denim Hidalgo and the Lucky Textiles facility in China once it became operational.  *Id.* at 54:21-56:9.

After the transaction closed in September 2006, Swift began to transition its production from the Boland plant to DNA's facility.  The Picanol looms were installed in DNA's facility.[5] DNA spent $857,500 to install the Picanol looms and also spent an additional $142,500 for equipment that was necessary to make the Picanol looms operational.  Galbraith Aff. ¶ 15.  DNA also hired and trained employees to run the new looms on the 24/7 schedule DNA anticipated running, at a cost of $507,559.[6]  *Id.* DNA's Tsudakoma looms were sold for $1 million, and DNA paid Swift $857,500 of the proceeds.  *Id.* ¶ 16.  DNA also paid $801,500 in dividends to Swift.  *Id.* ¶ 15.

A number of Swift employees went to work at the DNA facility to facilitate the transition.  DNA's Larry Galbraith was responsible for operational aspects of the transition, and he worked with Swift's John Heldrich on shade matching trials.[7] If the shade was not quite right, Heldrich's approach was to "work with the customer and get them to work with the wash in

---

[5] Again, according to Larry Galbraith, DNA did not need the new looms because they did not bring any new capability to DNA.  L. Galbraith Dep. 126:15-18; *accord* Pl.'s Resp. Ex. 34, Email from T. Driver to B. George, May 21, 2008, ECF NO. 44-34.
[6] After five months of running the 24/7 operation, DNA reverted back to its previous manufacturing schedule "due to lack of sales."  L. Galbraith Dep. 39:10-21.
[7] In mid-2007, Larry Galbraith was named chief operating officer of Swift Galey.  L. Galbraith Dep. 164:10-16 (stating that Galbraith filled the COO position until Swift Galey could find someone).

the laundry," which they did, for the most part.  L. Galbraith Dep. 102:23-103:21.  According to Holdings, the transition was "fairly smooth."  *Id.* at 107:4-6.  There was, however, some difficulty matching some of the shades, and it is undisputed that there were at least a hundred shade matching trials.

According to Swift, some of the "high margin . . . type programs" were lost "based on inability to perfectly match shades."  Heldrich Dep. Ex. 90, Email from J. Heldrich to L. Tilton, Mar. 29, 2007, ECF No. 64-1 at 67; *accord* Heldrich Dep. 67:18-68:11 (stating that DNA lost business with Lucky and Guess).  It is not clear from the present record how significant these losses were.

## VI.  Defendants' Sales Projections

Swift's Rick Waide developed the sales projections for the first five quarters after the transaction's closing date.  There were several different projections.  Two of them were attached to the Subscription Agreement.  Subscription Agreement Schedule 4.10, Project FM Qtrly Sales & Margin Forecast at SG00025078 to SG00025083, ECF 41-13 at 187 to 192.  The first set of projections, which assumed a capacity of 20 million yards, projected that DNA would produce 1.275 million yards of denim styles that were designed for the joint venture ("Swift product") and sell it for $4.45 million in the fourth quarter of 2006 and that DNA would produce 15.55 million yards of Swift

product in 2007 and sell it for $55 million. *Id.* at SG00025078
to SG00025080. The second set of projections, which assumed a
capacity of 23.5 million yards, projected that DNA would produce
1.275 million yards of Swift product and sell it for $4.45
million in the fourth quarter of 2006 and that DNA would produce
18.15 million yards of Swift product in 2007 and sell it for
$64.4 million. *Id.* at SG00025081 to SG00025083. In a different
projection, Defendants projected that DNA would operate at full
capacity to produce 22 million yards of Swift product at a price
of $3.27 a yard, for more than $70 million in revenue. Sayers
Dep. 154:2-16, 258:21-260:17; Sayers Dep. Ex. 47, ECF No. 58-5
at 40. It is undisputed that Holdings requested that Defendants
guarantee the sales projections in writing, but Defendants
refused. It is also undisputed that Holdings understood that
Defendants refused to guarantee the sales projections in
writing.

The Subscription Agreement stated that the projections set
forth in Schedule 4.10 were based on assumptions that were
"beyond the control of" Swift, and were "subject to risks and
uncertainties." Subscription Agreement § 4.10, ECF No. 41-13 at
29. It also stated that there were "possible developments that
could cause actual results to differ materially from those
forecasted." *Id.* In the Manufacturing Agreement, Swift and
Galey agreed "to use commercially reasonable good faith efforts

to achieve the sales projections set forth in Schedule 4.10 of the Subscription Agreement" but also stated that the agreement was "subject to various factors, conditions and assumptions" out of their control.  Manufacturing Agreement § 2.4, ECF No. 41-15 at 2.  The Manufacturing Agreement also provided that Swift and Galey made "no assurances" that the sales projections would be achieved.  *Id.*  The Subscription Agreement also stated that it, along with the schedules, exhibits and other subscription documents, constituted the entire agreement among the parties and superseded all prior agreements.  Subscription Agreement § 12.10, ECF No. 41-13 at 56.  Likewise, the Manufacturing Agreement stated that it constituted the "entire agreement between the Parties hereto with regard to the subject matter hereof."  Manufacturing Agreement § 9.9, ECF No. 41-15 at 10.

## VII. Swift's Inventory

It is undisputed that the Manufacturing Agreement permitted Swift to continue manufacturing its own product for 60 days from the closing date and that it would be permitted to complete work in process at the date of closing within 90 days from the closing date.  Manufacturing Agreement § 2.3, ECF 41-15 at 2. Holdings assumed that Swift would only produce product to fill existing orders.  L. Galbraith Dep. 166:8-20.

It is undisputed that Holdings knew that Swift had some denim inventory when the transaction documents were executed.

It is also undisputed that Holdings knew that Swift planned to sell any inventory it had on hand as of the date of the closing. Holdings, however, did not know how much inventory Swift had. When Larry Galbraith toured the Boland plant, he saw approximately 200,000 to 300,000 yards of denim.  *Id.* at 162:20-25.  Swift also had a large warehouse in Columbus, but it is not clear from the present record whether anyone from Holdings knew how much inventory Swift stored there.  According to Defendants, Swift had approximately 4 million yards of inventory when the transaction documents were executed.  Waide Dep. 30:4-16, ECF No. 70.   Other evidence suggests, however, that the Swift's inventory was much higher—in the 10.5 million yard or $30 million range.  Murray Dep. 185:10-18, ECF No. 65; *Id.* Ex. 100, Galey & Lord, LLC Balance Sheet, ECF No. 65-1 at 6; Pl.'s Resp. Ex. 27, Email from J. Heldrich to L. Tilton, Jan. 4, 2007, ECF No. 44-27 at 3; *see also* Pl.'s Resp. Ex. 14, Email from R. Annas to L. Tilton, June 6, 2006, ECF No. 44-14 at 3 (stating that Swift had approximately $36 million in inventory as of June 2006).

## VIII.    Post-Transition Sales

During fourth quarter 2006, DNA sold 259,000 yards of Swift product—styles that were developed for the joint venture—for "just under a million dollars," plus 3.2 million yards of the

DNA denim styles ("DNA legacy product") for $8.8 million.  L. Galbraith Dep. 99:23-100:4; *accord* Galbraith Aff. ¶ 10.

During 2007 and 2008, DNA gained momentum and set records in terms of yards shipped and yards invoiced.  In 2007, DNA sold a total of 6.6 million yards of Swift product, including 1.7 million yards of denim outside the projected styles.  *Id.* ¶ 13. Swift did not produce any sales orders for seventeen of the twenty-seven Swift product styles that were to be produced by DNA.  *Id.* ¶ 12.  During the same year, DNA sold a total of 11.6 million yards of DNA legacy product.  *Id.* Ex. B.  In all, DNA's sales for 2007 totaled approximately $59 million.  *Id.*  DNA's average price per yard in 2007 was $3.12, which was an improvement over its average price per yard in 2006 ($2.81), 2005 ($3.03), and 2004 ($2.74).

During late 2006 and early 2007, Swift was in the process of shutting and liquidating the Boland plant, and as part of that process, Swift attempted to sell its remaining denim inventory.  For example, during the fourth quarter of 2006, Swift "billed six million yards for $16.4 million."  Pl.'s Resp. Ex. 27, Email from J. Heldrich to L. Tilton, Jan. 4, 2007, ECF No. 44-27 at 3 (also noting that Swift planned to sell its "remaining 4.5 million yards of inventory").  Defendants contend that Swift did not sell the denim in competition with DNA and that the inventory was primarily sold abroad, but there is

evidence that the sales were domestic and that they adversely impacted sales of denim produced by DNA because Swift undercut DNA's price.  Pl.'s Resp. Ex. 26, Email from J. Murray to L. Tilton, Dec. 21, 2006, ECF No. 44-26 (stating that Swift had "identified $600,000 of additional billings," that Swift was "working on an additional $1 million—the vast majority going to domestic customers," and that "Rick Waide has developed a clever approach to pressure customers to take the inventory and . . . is running hard to make it happen"); Pl.'s Resp. Ex. 28, Email from R. Annas to L. Tilton, Mar. 16, 2007, ECF No. 44-28 (stating that wind-down of Boland inventory "impacted DNA to some extent as current customers bleed off Boland inventory first"); Pl.'s Resp. Ex. 29, Email from G. Bird to E. Ricci, Oct. 9, 2008, ECF No. 44-29 (stating that Swift's "inventories were not fully disclosed" by Swift and that the "market was flooded with lower cost [Swift product] resulting in capacity reduction"); *c.f.* Pl.'s Resp. Ex. 25, Email from J. Murray to L. Tilton, Sept. 13, 2006, ECF No. 44-25 (stating that Swift was trying "aggressively" to move blocks of inventory by putting "additional pressure on customers" and that Swift would "offer deals" if necessary).

In April or May of 2008, the interim CEO of Swift Galey told Larry Galbraith that Swift Galey was going to terminate its sales staff—both twill and denim—because "they could no longer

afford to pay them."   L. Galbraith Dep. 13:16-14:3.   Larry Galbraith transitioned the sales team to DNA.   He retained "most of the denim sales" team.   *Id.* at 14:3-7, 15:4-15.   After the transition, DNA stopped paying the 3% marketing fee to Swift. *Id.* at 181:19-21.

## IX.   The Foreign Ventures

At the time of the DNA transaction, Swift was involved in a joint venture in China with Lucky Textiles, as well as a joint venture in Mexico called Swift Denim Hidalgo.   It is undisputed that Holdings did not request that the deal terms include a guarantee that any foreign facilities, such as the Hidalgo venture or the Lucky facility, be kept open.   Nonetheless, DNA's business plan of transitioning to production of higher margin denim depended on Swift having low cost suppliers to produce low margin product.   Pl.'s Resp. Ex. 37, Email from B. George to L. Tilton, May 22, 2008, ECF No. 44-37.   Without a low cost supplier, DNA could not offer a full range of products to its major larger customers.   *Id.*

### A.   Lucky Denim Facility

The Chinese joint venture with Lucky Textiles involved construction of a new denim facility.   The construction required funding from Swift; Swift received a loan from Patriarch to pay for the construction.   Tilton Dep. 68:15-69:13, 72:25-74:1, ECF

No. 63.  Construction of the Lucky denim facility was complete by November 2007.

In March 2008, Bob George was named interim CEO of Swift, and he recommended that Swift exit the Lucky joint venture. Although Swift had made a substantial investment in Lucky—through its loan from Patriarch—George concluded that the joint venture had "broken down" because Lucky was "not reporting or sharing information." *E.g.,* Tilton Dep. 166:25-167:12.  Swift ceased "active management" of Lucky in 2008.  Lucky is now producing denim, and the venture is "ongoing," and Swift's "ownership is still there." *Id.* 164:3-9.

### B.   Swift Denim Hidalgo

The Swift Denim Hidalgo joint venture involved a denim plant in Mexico.  Larry Galbraith investigated the Swift Denim Hidalgo venture, and his purpose was to try to understand the cost structure and cash flow.  According to Galbraith, Hidalgo was "losing a substantial amount of money."  L. Galbraith Dep. 143:4-5.  During his investigation, Galbraith met several times with Solomon and Gabriel Helfon, who ran the Hidalgo facility. *Id.* 143:19-144:2.  According to Galbraith, the Hidalgo venture was not profitable; rather, it was "toast" because of a "combination of . . . bad performance" and a large loan Hidalgo took.  *Id.* at 146:23-148:4 (noting that "it was a very poor decision on everyone's part at that time to make that loan").

DISCUSSION

After the Court's ruling on Defendants' previously filed Motion to Dismiss, the following claims remained: Plaintiff's claim that Defendants fraudulently induced it to enter into this venture and its claim that Defendants violated fiduciary duties owed to it. *Denim N. Am. Holdings, LLC v. Swift Textiles, LLC*, No. 4:10-cv-45 (CDL), 2011 WL 318127, at *14 (M.D. Ga. Jan. 28, 2011) [hereinafter MTD Order]. Now that discovery has been completed, Defendants maintain that Holdings has failed to produce any evidence to create a genuine fact dispute as to these remaining claims. Accordingly, Defendants argue that they are entitled to summary judgment. As discussed below, the Court finds genuine factual disputes exist as to the following claims: (1) Plaintiff's fraudulent inducement claim predicated upon Defendants' sales projections; and (2) Plaintiff's breach of fiduciary duty claim based on Swift's sales made in competition with DNA and Swift's termination of its sales staff. Therefore, Defendants' motion for summary judgment is denied as to these claims. The Court grants summary judgment to Defendants on the following claims: (1) Plaintiff's fraudulent inducement claim predicated upon concealment of Defendant's financial condition; and (2) Plaintiff's breach of fiduciary claim based upon the foreign ventures.

26

## I.   Fraudulent Inducement Claims

Holdings claims that Defendants fraudulently induced Holdings to enter the joint venture with Defendants by misrepresenting (1) what volume of higher margin denim orders Swift would produce ("sales projection theory") and (2) that Swift would provide its financial records to Holdings, from which Holdings could discover the large amount of inventory Swift had ("financial records theory").  To recover on a fraudulent inducement claim, Holdings must show: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *Argentum Int'l, LLC v. Woods*, 280 Ga. App. 440, 443, 634 S.E.2d 195, 200 (2006) (internal quotation marks omitted).

### A.   Fraudulent Inducement Claim Based on Sales Projections

Defendants contend that the fraudulent inducement claim based on the sales projections theory fails for several reasons: (1) Holdings should be bound to disclaimers regarding the accuracy of the sales projections in the transaction documents because it failed to seek timely rescission of the agreement; (2) it was unreasonable as a matter of law for Holdings to rely on the future sales projections; and (3) the evidence does not support such a claim.  The Court addresses each argument in turn.

### 1.   Timeliness of Rescission

First, Defendants contend that Plaintiff's Sales Projection Claim fails as a matter of law because the transaction documents expressly disclaimed any reliance on the accuracy of those projections.  Manufacturing Agreement § 2.4, ECF No. 41-15 at 2 (stating that Swift and Galey agreed "to use commercially reasonable good faith efforts to achieve the sales projections set forth in Schedule 4.10 of the Subscription Agreement" and that the agreement was "subject to various factors, conditions and assumptions" out of their control).  The Court previously rejected this argument, finding that "Holdings has stated a claim for rescission of the Subscription Agreement, so any disclaimer provisions in that agreement do not preclude Holdings's fraudulent inducement claims as a matter of law." MTD Order at *14 (Jan. 28, 2011) [hereinafter MTD Order]. But now Defendants contend, based on a recent Georgia Court of Appeals opinion, that Holdings did not timely seek rescission.

"As a general rule, Georgia law requires a [party] seeking rescission of a contract on the ground of fraud to restore or offer to restore the consideration therefore as a condition precedent to bringing the action." *Vivid Invs., Inc. v. Best Western Inn-Forsyth, Ltd.*, 991 F.2d 690, 692 (11th Cir. 1993) (internal quotation marks omitted).  Georgia law also requires a plaintiff seeking rescission to do so "promptly" upon discovery

of the fraud.   O.C.G.A. § 13-4-60.   Generally, an attempt to seek rescission contemporaneously with the filing of a lawsuit is insufficiently prompt under Georgia law. *See, e.g., Nexus Servs., Inc. v. Manning Tronics, Inc.*, 201 Ga. App. 255, 255, 410 S.E.2d 810, 811 (1991) (stating that "the rule requiring one who seeks the rescission of a contract on the ground of fraud to restore, or offer to restore, the consideration received, *as a condition precedent to bringing the action*, is settled in this State") (internal quotation marks omitted); *accord Megel v. Donaldson*, 288 Ga. App. 510, 515, 654 S.E.2d 656, 661 (2007) (noting that a party alleging fraudulent inducement has "two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud") (internal quotation marks omitted).

Here, Holdings did not seek rescission of the Subscription Agreement or Operating Agreement before filing this action. Compl. ¶¶ 141-42. Georgia, however, recognizes an exception to the tender rule when tender would be impossible or unreasonable. *See, e.g., Orion Capital Partners, L.P. v. Westinghouse Elec. Corp.*, 223 Ga. App. 539, 543, 478 S.E.2d 382, 385 (1996) (stating defrauded party "need not offer to restore where the defrauding party has made restoration impossible, or when to do so would be unreasonable").   In denying Defendants' motion to dismiss on this point, the Court found that "'[a]t the very

least, [Holdings] has raised factual issues concerning whether requiring tender would be reasonable under the circumstances.'" MTD Order at * 13 (alterations in original) (quoting *Vivid Invs., Inc.*, 991 F.2d at 692-93).

Defendants now contend that a recent case, *Weinstock v. Novare Group, Inc.*, 309 Ga. App. 351, 710 S.E.2d 150 (2011), stands for the proposition that a party's contention that tender would be impossible or unreasonable does not excuse its failure to timely seek rescission.  That contention is incorrect.  In *Weinstock*, two condominium purchasers alleged that the seller fraudulently induced them into purchasing the condominiums by marketing them as having spectacular city views while intending to block those same views by later constructing another building on an adjacent lot.  *Weinstock*, 306 Ga. App. at 352, 710 S.E.2d at 153.  The trial court granted summary judgment to the seller, and the Georgia Court of Appeals affirmed, holding that the purchasers did not timely rescind their purchases and therefore could not rely on representations that were not made in their purchase contract.  *Id.* at 354-56, 710 S.E.2d at 154-55. Critical to the court's holding was that the purchasers "did not attempt to rescind the purchase contract before filing suit, nor did they raise a rescission claim contemporaneously therewith." *Id.* at 354, 710 S.E.2d 154.  Almost a year after filing their original complaint, the purchasers amended their complaint to

add a prayer to rescind the purchase contract. *Id.* The court found that the amendment was too late because, in general, "a claim for damages unaccompanied by a claim for rescission operates as an election to affirm the underlying contract." *Id.* Finally, the court stated in a footnote that even if tender was not required because it was impossible or unreasonable, that did not excuse the purchasers' unreasonable delay—one year after filing the complaint—in electing the remedy of rescission. *Id.* at 356 n.5, 710 S.E.2d at 155 n.5.

Latching onto the language of that footnote, Defendants contend that *Weinstock*-contrary to settled law-stands for the broad proposition that even if tender would be impossible or unreasonable, that does not excuse a party's failure to timely seek rescission. Here, unlike in *Weinstock*, Holdings made a claim for rescission in its original complaint. Compl. ¶¶ 133-44. Therefore, the actual holding in *Weinstock* is inapplicable.

Defendants attempt to bridge their argument's analytical gap by claiming, based on *Orion Capital Partners*, that Holdings affirmed the contracts by engaging in management decisions and continuing to operate the company.[8]   This argument is likewise unpersuasive.  In *Orion Capital Partners*, the purchaser of a dog food company sued the seller for fraudulent inducement and

---

[8] Defendants cited a number of other cases in support of this proposition.  They are distinguishable from this case for the same reasons *Orion Capital Partners* is distinguishable.

rescission. *Orion Capital Partners*, 223 Ga. App. at 539, 478 S.E.2d at 383. The trial court granted summary judgment in favor of the defendants and the Georgia Court of Appeals affirmed, finding that there was no basis for excusing the plaintiff's seven month delay in seeking rescission after discovering the fraud. *Id.* at 543, 478 S.E.2d at 385. The Court of Appeals found that the plaintiff engaged in a series of management decisions that were inconsistent with contract rescission because they were an attempt to continue operating the company in a profitable manner. *Id.* Moreover, there was no claim that rescission would have been impossible or unreasonable. *Id.*

Plaintiff's actions here are completely dissimilar. In *Orion Capital Partners*, the plaintiff purchased an entire company from the defendant. Here, Holdings *sold* only *part* of its business to Swift and entered into the DNA joint venture. The plaintiff *Orion Capital Partners* could have simply tendered the company back to the seller, but Holdings did not have that option. Instead, after Swift arguably walked away from the joint venture, Holdings was left to operate DNA as it had before the joint venture. Therefore, Plaintiff's management decisions and continued operation of DNA are not inconsistent with rescission.

For all of these reasons, the Court concludes that a genuine fact dispute exists as to whether Holdings timely sought

rescission.   Accordingly,   the   fraudulent   inducement   claim premised on the sales projection theory does not fail based on this argument.

### 2.   Reliance on Future Sales Projections

Defendants   also   contend   that   the   fraudulent   inducement claim   premised   on   the   sales   projection   theory   fails   because Holdings could not rely on future sales projections as a matter of   law.    It   is   well   settled   that   "[i]n   most   circumstances, actionable fraud cannot be predicated on a promise contained in a contract because the promise is to perform some act in the future, and [n]ormally, fraud cannot be predicated on statements which are in the nature of promises as to future events."   *BTL COM Ltd. v. Vachon*, 278 Ga. App. 256, 258, 628 S.E.2d 690, 694 (2006) (second alteration in original) (internal quotation marks omitted).    "An   exception   to   the   general   rule   exists   where   a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place."[9] *Id.* (internal quotation marks omitted).

---

[9] Defendants contend that the *BTL COM Ltd.* exception only relates to the *scienter* element of fraud. Defendants are correct that *BTL COM Ltd.* did not address whether the plaintiff reasonably relied on the alleged misrepresentations.   *BTL COM Ltd.*, 278 Ga. App. at 258 n.2, 628 S.E.2d at 693 n.2 ("The issue[] of whether BTL reasonably relied on the representations contained in the Agreement . . . [is] not properly before us in this appeal."). But the courts have not limited the *BTL COM Ltd.* exception to the *scienter* element of fraud.   *See, e.g.*, *TechBios, Inc. v. Champagne*, 301 Ga. App. 592, 594-95, 688 S.E.2d 378, 381 (2009).   In *TechBios*, the court reversed the trial court's dismissal of a fraud claim based on a promise as to future

Here, Holdings contends that its fraudulent inducement claim can be premised on a representation as to a future event-the sales projections-because there is evidence that Defendants knew when they made the projections that the sales would not be achieved as promised.

The only Georgia appellate court opinion Defendants cited in support of their position that Holdings cannot reasonably rely on future sales projections is *Marler v. Dancing Water Lakes, Inc.*, 167 Ga. App. 99, 305 S.E.2d 876 (1983). In *Marler*, the Georgia Court of Appeals stated the rule as:

> [W]here the representation consists of general commendations or mere expressions of opinion, hope, expectation, and the like, *and where it relates to matters which from their nature, situation, or time, can not be supposed to be within the knowledge or under the power of the party making the statement*, the party to whom it is made is not justified in relying upon it and assuming it to be true; he is bound to make inquiry and examination for himself so as to ascertain the truth.

167 Ga. App. at 100, 305 S.E.2d at 877 (emphasis added) (internal quotation marks omitted). This rule makes sense because if the party making the statement lacks knowledge of or power over the matter, he cannot have a present intent not to

---

events where "it was possible for [plaintiff] to introduce evidence showing that the alleged false representations were made with a present intent not to perform, were designed to induce TechBios to act or refrain from acting, and resulted in damage to TechBios *as a result of its justifiable reliance*." *Id.* (emphasis added). And Defendants have not explained how their contention – that a plaintiff can never reasonably rely on a representation as to future events – can stand with the *BTL COM Ltd.* exception which allows plaintiffs to prove *scienter* in relation to representations as to future events.

perform or knowledge that the future event will not take place. In contrast, here, Plaintiff's fraudulent inducement claims relate to subject matter-the future sales projections-that Defendants had both knowledge of and power over. Therefore, a genuine fact dispute remains as to whether Holdings reasonably relied on the future sales projections. Accordingly, Plaintiff's fraudulent inducement claim premised on the sales projections does not fail based on this argument.

### 3.   *Evidence Supporting Sales Projections Theory*

Defendants also argue that the evidence does not support a fraudulent inducement claim premised on the sales projection theory.  Defendants argue that (1) DNA met or exceeded the sales projections in the Subscription Agreement; (2) there is no evidence Defendants knew that the sales projections were false when they were made; and (3) the lack of sales were DNA's fault because of the problems with shade matching.

As discussed above, under the most conservative sales projection, Defendants projected that DNA would sell 1.275 million yards of Swift product in fourth quarter 2006 for a total of $4.45 million and that DNA would sell 15.55 million yards of Swift product in 2007 for a total of $55 million. Based on Galbraith's affidavit, also discussed above, a reasonable factfinder could conclude that DNA's actual sales missed these marks by a wide margin.  According to Galbraith,

DNA only sold 259,343 yards of Swift product in fourth quarter 2006, for a total of $993,185—approximately 20% of the projection. Galbraith Aff. Ex. B. In 2007, DNA only sold 6.6 million yards of Swift product for a total of $24 million—a little more than 40% of the lowest projection. *Id.* Defendants pointed to no evidence from which the Court can find *as a matter of law* that the shade matching issues caused these problems, particularly after production ramped up in 2007. The Court also cannot conclude *as a matter of law* that Defendants did not know the sales projections were false when they were made. As discussed above, for example, a reasonable factfinder could conclude that Defendants stockpiled inventory before the transaction and intended to offer deals to sell the inventory after the transaction. From this, a factfinder could reasonably infer that Defendants did not intend to follow through on promises to sell the DNA-manufactured Swift product.

For all of these reasons, the Court finds that the evidence viewed in the light most favorable to Holdings supports a fraudulent inducement claim premised on the sales projection theory. Accordingly, Defendants are not entitled to summary judgment on this claim.[10]

---

[10] In a footnote, Defendants summarily argue that the claims against Galey and Patriarch should be dismissed because Holdings failed to present evidence that they made oral or written representations regarding the sales presentations. As discussed above, however, there is sufficient evidence from which a reasonable factfinder could

B.   <u>Fraudulent Inducement Claim Based on Concealment of
     Financial Condition</u>

The fraudulent inducement claim premised on the financial records theory appears to be based on Defendants' failure to provide certain financial information about Swift and Galey despite repeated requests from Holdings and Defendants' contractual representation that they would provide the information to Holdings.   Defendants are entitled to summary judgment on this claim.

In *Bogle v. Bragg*, 248 Ga. App. 632, 548 S.E.2d 396 (2001) a mining industry executive alleged that a mining company's employees fraudulently induced him into purchasing stock in the company by making misrepresentations, including a misrepresentation before the deal closed that "a [mining company] financial statement would be ready in a few days and that [the executive] would receive it in due course."   *Bogle*, 248 Ga. App. at 633-34, 548 S.E.2d at 399.   In affirming summary judgment for the mining company, the Georgia Court of Appeals found that even though the mining company represented that it would provide financial statements, "it was [the executive's] choice to proceed with the [transaction] without them."   *Id.* at 636, 548 S.E.2d at 401.   Given that it was "an arm's length transaction between persons experienced in the mining business"

conclude that Galey and Patriarch personnel participated in the decision to propose the joint venture and in the negotiations surrounding the deal.

where there was no special duty to make disclosures, the court found that the mining company's failure to produce the promised financial statements did not support a claim for fraudulent inducement. *Id.* at 636-37, 548 S.E.2d at 401.

Here, as in *Bogle*, Defendants promised Holdings financial statements that they never produced. Further, as in *Bogle*, "it was [Plaintiff's] choice to proceed with the [transaction] without them." *Bogle*, 248 Ga. App. at 636, 548 S.E.2d at 401. Holdings does not contend that Defendants had any other special duty to make disclosures. Therefore Holdings cannot now claim it was fraudulently induced into the joint venture by Defendants' promise to produce financial statements when Holdings chose to proceed with the transaction knowing that Defendants had not produced the promised financial statements. For all of these reasons, Defendants are entitled to summary judgment on the fraudulent inducement claim premised on the financial records theory.

## II. Fiduciary Duty Claims

Holdings also makes a claim against Swift for breach of fiduciary duty. Defendants contend that the fiduciary duty claim fails as a matter of law because Swift did not owe Holdings a fiduciary duty. Defendants further argue that even if Swift did have a fiduciary duty to Holdings, there is no evidence of a breach of fiduciary duty. As discussed below, the

Court concludes that there is a genuine fact dispute as to whether Swift owed Holdings a fiduciary duty, and there is also a fact dispute as to whether Swift breached that duty.

    A.   Did Swift Owe a Fiduciary Duty to Holdings?

    Under Georgia law, a managing member of a limited liability company owes a fiduciary duty to its fellow members. O.C.G.A. § 14-11-305(1) ("In managing the business or affairs of a limited liability company[, a] member or manager shall act in a manner he or she believes in good faith to be in the best interests of the limited liability company[.]"); *accord ULQ, LLC v. Meder*, 293 Ga. App. 176, 184, 666 S.E.2d 713, 720 (2008). However, "a person who is a member of a limited liability company in which management is vested in one or more managers, *and who is not a manager*, shall have no duties to the limited liability company or to the other members solely by reason of acting in his or her capacity as a member." O.C.G.A. § 14-11-305(1); *accord Meder*, 293 Ga. App. at 184-85, 666 S.E.2d at 720-21.

    Swift and Holdings are both members of DNA.  As discussed above, under the Operating Agreement, DNA is managed by its members through a board of eight managers.  Four managers are appointed by Holdings, and four are appointed by Swift.  No manager is permitted to take any action unless the action has been approved by at least a majority of the managers.

Swift argues that it owes Holdings no fiduciary duty in connection with DNA because it was a "non-managing" member of DNA. Although Swift admits it appointed managers that managed DNA, Swift maintains that it was not a manager. Holdings responds that Swift managed DNA through its appointed managers. The critical question for the Court is whether Swift's appointment of four of DNA's eight managers means that Swift itself was a managing member of DNA.

Generally, non-member managers of a Georgia LLC are "designated, appointed, [or] elected . . . by the approval of more than one half by number of the members." OCGA § 14-11-304(b)(1). Here, though, the Operating Agreement permitted Swift to appoint four managers—and replace the managers it appointed—without Plaintiff's approval. Moreover, under the Operating Agreement, no manager is permitted to take any action unless the action has been approved by at least a majority of the managers. Therefore, Swift's ability to appoint four managers gave it *de facto* control of the DNA board of managers. That control creates a genuine fact dispute as to whether Swift was a managing member of DNA and therefore owed fiduciary duties to Holdings.[11] The next question is whether there is a fact dispute as to whether Swift breached those duties.

---

[11] The Court previously observed that Swift's contention that it did not manage DNA "is somewhat disingenuous given that [Swift's] argument

B.   <u>Did Swift Breach its Fiduciary Duty to Holdings?</u>

Holdings contends that Swift breached its fiduciary duty to Holdings in three ways: (1) selling denim in competition with DNA, (2) terminating the DNA sales force, and (3) by closing its foreign manufacturing facilities.

### 1.   *Sales in Competition with DNA*

Defendants argue that there is no evidence that Swift's sales of its inventory were in competition with DNA. Defendants point out that Swift's inventory sales were anticipated. As discussed above, while it is undisputed that Holdings knew that Swift planned to sell any inventory it had on hand as of the date of the closing, there is also evidence that Swift had millions of yards of inventory that it did not disclose to Holdings. Although Defendants contend that Swift sold the inventory abroad and not in competition with DNA, there is evidence that the sales were domestic and that they adversely impacted sales of denim produced by DNA because Swift undercut DNA's price and flooded the market with its inventory. For all of these reasons, summary judgment is not warranted on the fiduciary duty claim based on Swift's competing sales of inventory.

---

in support of its motion to dismiss DNA as a party in this action, which the Court accepted, was based upon the fact that the Swift-appointed managers had not approved the filing of the action by DNA." MTD Order at *7 n.5.

2.   *Sales Force Termination*

Holdings also claims that Swift breached its fiduciary duty by terminating its sales personnel.  As discussed above, there is evidence that Swift was responsible for the marketing and sales of DNA's products and that a large part of Swift's consideration for the joint venture was its ability to sell DNA's product.  Swift contends that there was no breach because Holdings requested that the sales force be transferred to DNA. As discussed above, however, there is evidence that Swift planned to terminate the sales staff, and that is why Larry Galbraith decided to transition the denim sales team to DNA. Based on all of this, the Court finds that a genuine fact dispute exists as to the fiduciary duty claim premised on Swift's termination of its sales staff.

C.   <u>Foreign Ventures</u>

Holdings summarily argues that Defendants breached fiduciary duties to Holdings by closing its two foreign manufacturing plants.  The undisputed evidence shows that Swift Denim Hidalgo was losing money because it was performing badly and was overleveraged.  Holdings presented no evidence that Swift Denim Hidalgo was not actually failing or that Defendants intentionally caused it to fail.  It is unclear to the Court how Defendants breached a fiduciary duty by deciding not to pour more money into a failing plant.

It is likewise unclear how Defendants breached a fiduciary duty to Holdings with regard to the Lucky facility in China. Holdings argues that Defendants sabotaged the Lucky facility, and Plaintiff's theory is premised on its argument that Defendants closed the Lucky facility.  The undisputed evidence, however, is that the Lucky facility did not close, that it is actually producing denim, and that it is still owned by Swift. For these reasons, the Court finds that Holdings has failed to demonstrate a jury question with regard to the foreign joint ventures.

### III. Damages

Defendants argue that even if there is evidence to support claims of fraudulent inducement and breach of fiduciary duty, the claims still fail because Holdings has not presented evidence that it was damaged by Defendants' actions and has not presented an expert on damages.  Holdings has, however, pointed to evidence of: (1) how much denim DNA sold by style (Swift vs. DNA); (2) Swift's inventory sales; (3) the pricing of the denim; and (4) the cost of installing the Picanol looms, training the staff on them, and other costs and payments related to the transaction.  Damage to Holdings may be calculated based on these factors, and the Court cannot conclude as a matter of law that these calculations would be so complicated that a jury or the Court could not understand them without expert testimony.

43

CONCLUSION

As discussed above, Defendants' Motion for Summary Judgment (ECF No. 40) is granted in part and denied in part.  Defendants' motion is denied as to the following claims: (1) Plaintiff's fraudulent inducement claim predicated upon Defendants' sales projections and (2) Plaintiff's breach of fiduciary duty claim based on Swift's sales made in competition with DNA and Swift's termination of its sales staff.  Defendants' motion for summary judgment is granted as to the following claims:  (1) Plaintiff's fraudulent inducement claim predicated upon concealment of Defendant's financial condition; and (2) Plaintiff's breach of fiduciary duty claim based upon the foreign ventures. Defendants' Motion to Dismiss or for an Adverse Inference (ECF No. 42) is denied, as is Defendants' Motion to Strike (ECF No. 50).

IT IS SO ORDERED, this 8th day of September, 2011.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE