IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

DENIM NORTH AMERICA HOLDINGS,  *
LLC,
                                 *

     Plaintiff,
                                 *

vs.                              CASE NO. 4:10-CV-45 (CDL)
                                 *

SWIFT TEXTILES, LLC,
GALEY & LORD, LLC, and      *
PATRIARCH PARTNERS, LLC,
                                 *

     Defendants.
                                 *

## O R D E R

The jury returned a verdict in this action finding that Defendants Swift Textiles, LLC, Galey & Lord, LLC, and Patriarch Partners, LLC fraudulently induced Plaintiff, Denim North America Holdings, LLC ("Plaintiff" or "Holdings"), to enter a Subscription Agreement and an Operating Agreement (collectively, "Agreements") that created a joint venture to manufacture and sell denim products. Jury Verdict Form 1-2, ECF No. 145. The jury found that Defendants' fraudulent inducement authorized rescission of the Agreements. *Id.* at 2-3. In light of its finding in favor of Plaintiff on its rescission claim, the jury never reached Plaintiff's alternative claim for breach of fiduciary duty. *Id.* at 4. The Court determined prior to submission of the case to the jury that upon a finding by the jury that the Agreements should be rescinded, it would be

appropriate for the Court (and not the jury) to use its equitable powers to fashion the precise remedy necessary to place the parties in the positions they occupied immediately prior to their entry into the Agreements that created the joint venture.  The parties agreed with this conclusion by the Court.

After the jury verdict, Defendants renewed their Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(b) as to both Plaintiff's fraudulent inducement rescission claim and Plaintiff's fiduciary duty claim (ECF No. 148).  The parties have also submitted briefs on the issue of what remedy is appropriate for Plaintiff's fraudulent inducement rescission claim if the Court denies Defendants' Motion for Judgment as a Matter of Law.  For the following reasons, the Court denies Defendants' Motion for Judgment as a Matter of Law and orders that the Agreements are rescinded and the joint venture is terminated.  The Court further orders that to restore the parties to the positions they occupied immediately prior to their entry into the rescinded Agreements, the Defendants shall convey their ownership interest in Denim North America, LLC to Holdings, and Holdings shall pay Defendants $2,242,500.00.[1]

---

[1] Although the jury never reached Plaintiff's fiduciary duty claim and it is unnecessary for this Court to address that claim now that it declines to disturb the jury's verdict on the fraudulent inducement rescission claim, the Court nevertheless finds it appropriate to rule on Defendants' motion for judgment as a matter of law as to the fiduciary duty claim for the sake of judicial economy should the Court of Appeals disagree with the Court's ruling on the rescission claim.

Pursuant to the jury verdict and the parties' stipulation as to the amount, Holdings shall recover its attorney's fees of $275,000.

DISCUSSION

I.  **Defendants' Motion for Judgment as a Matter of Law**

In ruling on a Rule 50 motion for judgment as a matter of law, the Court must "view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party." *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1347 n.5 (11th Cir. 2007). The question before the Court regarding a motion for judgment as a matter of law is whether there is a "legally sufficient evidentiary basis to find for the party." Fed. R. Civ. P. 50(a)(1). Judgment as a matter of law "is appropriate when a plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Proctor*, 494 F.3d at 1347 n.5 (internal quotation marks omitted). If there is "substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Id.* (internal quotation marks omitted).

A.  Plaintiff's Fraudulent Inducement Claim

It is undisputed that the jury specifically found that Holdings proved by a preponderance of the evidence all of the

essential elements for a rescission claim based on Defendants'
fraudulent inducement.  Therefore, the Court must review the
evidence, construing all reasonable inferences in Plaintiff's
favor, and determine whether any evidence exists supporting the
jury's findings and whether those findings support a rescission
claim based on fraudulent inducement under Georgia law.
Defendants contend that there was insufficient evidence for the
jury to find that Holdings had established the essential
elements of its fraudulent inducement claim.  Defendants also
assert that there was insufficient evidence for the jury to find
that Holdings timely and properly sought rescission.

Prior to trial, the Court found that the record at that
stage of the proceedings revealed a genuine fact dispute on
these issues.  *Denim N. Am. Holdings, LLC v. Swift Textiles,
LLC*, Case No. 4:10-CV-45 (CDL), 2011 WL 3962278, at *11-*13
(M.D. Ga. Sept. 8, 2011).  Based on the evidence presented at
trial, the jury concluded that each Defendant fraudulently
induced Holdings to enter the Agreements that formed the joint
venture by intentionally making a misrepresentation related to a
material existing fact, that Holdings relied on the
misrepresentation and suffered injury as a result.  Jury Verdict
Form 1-2; *accord* Court's Trial Ex. 1, Jury Instructions 7-9.
The jury also found that upon learning of the fraud, Holdings
provided Defendants with reasonable and prompt notice, under the

circumstances, of its intention to rescind the agreements and terminate the joint venture; that when Holdings learned of the fraud it would have been impossible or unreasonable for Holdings to return to Defendants the things that Holdings received as part of the joint venture; and that Holdings had not waived its right to rescind the Agreements.  Jury Verdict Form 1-2.  These findings are supported by the evidence and are not against the great weight of the evidence, so the Court cannot grant Defendants' motion on this ground.[2]

Defendants also contend that Holdings failed, as a matter of law, to produce sufficient evidence that it reasonably relied on a misrepresentation made by Defendants.  The Court previously addressed this issue in pre-trial rulings and rejected Defendants' argument.  *See Denim N. Am. Holdings, LLC*, 2011 WL 3962278, at *14.  After the trial, however, the Georgia Supreme Court decided the case of *Novare Group, Inc. v. Sarif*, 290 Ga.

---

[2] Defendants also argue that Plaintiff's fraudulent inducement claim fails because Holdings did not seek rescission of the agreements prior to filing suit.  Defendants point out that in *Novare Group, Inc. v. Sarif*, 290 Ga. 186, 188, 718 S.E.2d 304, 307-08 (2011), the Georgia Supreme Court reiterated the general rule that a party who seeks rescission of a contract because of fraud must "restore, or offer to restore, the consideration received, *as a condition precedent* to bringing" a fraud action in court.  This is not a new rule.  *See Denim N. Am. Holdings, LLC*, 2011 WL 3962278, at *11 (stating general rule that party seeking rescission must restore or offer to restore consideration as a condition precedent to bringing a fraud action).  However, there is a limited exception to this rule, and nothing in *Sarif* suggests abandonment of this exception.  Under the exception, a defrauded party "need not offer to restore where the defrauding party has made restoration impossible, or when to do so would be unreasonable."  *E.g., Orion Capital Partners, L.P. v. Westinghouse Elec. Corp.*, 223 Ga. App. 539, 543, 478 S.E.2d 382, 385 (1996).

186, 718 S.E.2d 304 (2011), which this Court found may be relevant to this very issue and therefore ordered the parties to brief its applicability. Having considered the issue further and having studied *Sarif*, the Court reaffirms that a jury question existed on this issue and that sufficient evidence was presented at trial to support the jury's verdict.

Holdings maintained that Defendants fraudulently induced it to enter the joint venture by making misrepresentations about what contributions Defendants would bring to the venture and about the amount of sales Defendants would achieve for the venture. Defendants' contributions to the joint venture included a mix enhancement for bringing in higher-margin customers to the venture and a volume enhancement for the additional volume of sales that Defendants would bring to the venture. Defendants promised Holdings that they would use commercially reasonable good faith efforts to achieve certain sales projections. Pl.'s Trial Ex. 12, Manufacturing Agreement ¶ 2.4. Defendants made sales projections both in pre-contract negotiations and in the Subscription Agreement itself. *See* Pl.'s Trial Ex. 5, Subscription Agreement Schedule 4.10, SG00025076 to SG00025083; Pl.'s Trial Ex. 22, Sales Projections.

Holdings asserts that when Defendants made the promises regarding their contributions to the joint venture and their intent to use commercially reasonable good faith efforts to

achieve certain sales objectives, Defendants had no intention of performing and knew that the sales would not be achieved as promised. Defendants argue that Holdings could not rely on the sales projections as a matter of law because the Subscription Agreement contained a disclaimer regarding the sales projections and because the promises related to the occurrence of a future event. The Subscription Agreement provides, in pertinent part, that Holdings "acknowledge[s] and agree[s]" that the projections "are based on a number of assumptions that are beyond the control of [Defendants], including, but not limited to, market conditions and customer choices, are based on certain assumptions about [Plaintiff's] manufacturing capability, and are subject to risks and uncertainties. There are possible developments that could cause actual results to differ materially from those forecasted in such sales projections." Pl.'s Trial Ex. 5, Subscription Agreement at SG00024920. As previously noted, Defendants made the same argument prior to trial, and the Court rejected it, concluding that there was a fact dispute as to whether Holdings reasonably relied on Defendants' promises related to sales of the joint venture's products. *Denim N. Am. Holdings, LLC,* 2011 WL 3962278, at *14.

The Court interprets Georgia law to permit a rescission fraud claim based on a promise as to a future event even if the written contract, which the plaintiff seeks to rescind due to

the fraud, contains a general disclaimer and a merger clause stating that the written agreement supersedes pre-contract representations. *See City Dodge, Inc. v. Gardner*, 232 Ga. 766, 770, 208 S.E.2d 794, 797-98 (1974). In *City Dodge*, the Georgia Supreme Court found that a general disclaimer that a used car was purchased "as is" did not negate the dealer's pre-contract promise that the car had never been in a wreck and that there was a jury question on whether the buyer relied on the pre-contract promise. *Id.* The Georgia Supreme Court observed that it would be "inconsistent to apply a disclaimer provision of a contract in a tort action brought to determine whether the entire contract is invalid because of alleged prior fraud which induced the execution of the contract." *Id.* "If the contract is invalid because of the antecedent fraud, then the disclaimer provision therein is ineffectual since, in legal contemplation, there is no contract between the parties." *Id.* at 770, 208 S.E.2d at 798; *cf. First Data POS, Inc. v. Willis*, 273 Ga. 792, 794-95, 546 S.E.2d 781, 784 (2001) (holding that in a *non-rescission case* a contractual disclaimer may bar a fraud claim based on a pre-contract promise that *directly contradicts* the terms of the written contract).

In this case, Holdings presented evidence that Defendants had no intention of using commercially reasonable good faith efforts to achieve the forecasted sales results when they made

representations that they would do so and that these misrepresentations induced Holdings to enter the Agreements. As the Georgia Supreme Court recognized in *City Dodge,* it would be inconsistent with the nature of a fraudulent inducement rescission action to find that a disclaimer in the contract that Plaintiff seeks to establish is invalid in its entirety bars the claim. *City Dodge*, 232 Ga. at 770, 208 S.E.2d at 797-98. Therefore, the Court finds that the existence of the disclaimer language in the rescinded Agreements does not bar the rescission claim as a matter of law.

In a related argument, Defendants argue that Holdings' fraudulent inducement claim fails as a matter of law because a fraud claim cannot be based on a promise to perform a future act, particularly when there is a disclaimer in the contract stating that the promised results may not be achieved. The Court has previously recognized that although a fraud claim cannot be based on a promise to perform an act in the future, an exception exists under Georgia law where the promise is made "'with a present intent not to perform or where the promisor knows that the future event will not take place.'" *Denim N. Am. Holdings, LLC*, 2011 WL 3962278, at *13 (quoting *BTL COM Ltd. v. Vachon*, 278 Ga. App. 256, 258, 628 S.E.2d 690, 694 (2006)). The Court concluded that a jury issue existed in this case as to whether this exception applied because there was "evidence that

Defendants knew when they made the projections that the sales would not be achieved as promised." *Id.* The jury ultimately resolved this issue in Plaintiff's favor, finding that Defendants never intended to perform. As explained in more detail below, sufficient evidence was presented at trial to support this conclusion.

The Court does find it necessary to further address the Georgia Supreme Court's recent decision in *Sarif*, which was decided less than a month after the trial in this case concluded. Based on *Sarif*, Defendants contend that they are entitled to judgment as a matter of law on the fraudulent inducement claim. In *Sarif*, the plaintiffs purchased residential condominiums on the south side of a 26-story Atlanta building; the brokers advertised "spectacular city views" from the condominiums and represented that any future development on the south side of the building would be low- to mid-rise office buildings. *Sarif*, 290 Ga. at 186, 718 S.E.2d at 306. The plaintiffs alleged that despite these allegations, the property developers had developed plans to develop a 46-story building directly across the street, which would block the city views. *Id.* Each of the plaintiffs signed an agreement stating that the views from his condominium "may change over time due to . . . additional development." *Id.* at 187, 718 S.E.2d at 307. Each agreement also contained a disclaimer stating that oral

representations "CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF SELLER." *Id.* Finally, each agreement contained a comprehensive merger clause. *Id.* & n.2.

The plaintiffs brought an action against the brokers and developers, alleging fraud in the inducement. The Georgia Supreme Court held that the plaintiffs were not entitled to the remedy of rescission and that the defendants were therefore entitled to judgment on the pleadings as to the plaintiffs' fraud based claims. The Georgia Supreme Court found that the plaintiffs were not entitled to rescind the agreements because "[s]tatements that directly contradict the terms of the agreement or offer future promises simply cannot form the basis of a fraud claim for the purpose of cancelling or rescinding a contract." *Id.* at 189, 718 S.E.2d at 308. The Georgia Supreme Court stated that "the only type of fraud that can relieve a party of his obligation to read a written contract and be bound by its terms is a fraud that prevents the party from reading the contract." *Id.*

On initial examination, a good faith argument can be made that *Sarif* appears to support Defendants' argument, but interpreting *Sarif* as Defendants urge also places it at odds with earlier established precedent by the Georgia Supreme Court, including *City Dodge.* Since the Supreme Court did not indicate it was overruling this well established earlier precedent and in

fact cited it approvingly, this Court is naturally reluctant to give *Sarif* the broad meaning asserted by Defendants.  A closer reading of *Sarif* reveals that it can be reconciled with *City Dodge* and distinguished from the present case.

The crux of the plaintiffs' argument in *Sarif* was that they were not bound by the terms of the agreements they signed because the defendants "promised 'spectacular city views' from the south side of [the building] at the same time that [they] were moving forward with plans to erect a 46-story condominium across the street that would ultimately block [plaintiffs'] views."  *Id.*  The plaintiffs, however, all signed agreements that expressly stated that the views may change over time, and the court concluded that "oral representations of the sellers could not be relied upon, [the plaintiffs] did not in fact rely upon any oral representations or statements of [the sellers], and the entire agreement between the parties was set forth in the terms of the written contract."  *Id.*  Therefore, the court found that the plaintiffs could not rescind the agreements because the plaintiffs were "not entitled to back out of a written agreement whose terms expressly contradict the oral representations on which [the plaintiffs] claim to have relied." *Id.*  Accordingly, the Georgia Supreme Court concluded that the plaintiffs were bound by the terms of their agreements and that they could not maintain their claims for fraud in the inducement

because they could not justifiably rely on representations outside of the agreement.  *Id.* at 190, 718 S.E.2d at 309.

The Georgia Supreme Court in *Sarif* recognized that "justifiable reliance may be a jury question in a fraud case where no contract exists or *where the contract has become void*." *Id.* (citing *City Dodge*, 232 Ga. at 770, 208 S.E.2d at 794). Defendants contend, however, that this is a case where justifiable reliance is a question of law because "the contract language prevails and the contract's merger clause precludes reliance on oral representations." *Id.* Focusing narrowly on the sales projections—which contain disclaimers—Defendants assert that their promises regarding denim sales are akin to the *Sarif* broker's promise regarding "spectacular city views." The Court disagrees. In *Sarif*, the key promise—spectacular city views—appeared nowhere in the buyers' contracts, and the contracts directly contradicted the promise by stating that future development could alter the views. Had the buyers read their contracts, they would have been on notice that the "spectacular city views" were not guaranteed to last. In contrast, here, Defendants "bought" their share of the joint venture chiefly with their promise to bring higher-margin customers and a large volume of sales to the joint venture, and Defendants promised Holdings that they would use commercially reasonable good faith efforts to achieve the sales projections

they had provided.   Nothing in the Agreements between the parties directly contradicts these promises; in fact, these promises are memorialized in the Agreements themselves. Therefore, the Court is satisfied that a jury question existed on the effect of the disclaimers with regard to the sales projections.   The Court does not find that the disclaimers are irrelevant.   Rather, the Court simply concludes that the disclaimers do not entitle Defendants to judgment as a matter of law.   The jury considered the disclosure language in determining whether Holdings reasonably relied on Defendants' representations, and the jury resolved that issue in Plaintiff's favor.

The jury's finding is supported by the evidence at trial. Based on the evidence presented to the jury, a reasonable juror could conclude that Defendants did make material misrepresentations to Holdings because the evidence viewed in Plaintiff's favor suggests that Defendants had no intention of using commercially reasonable sales efforts to sell the denim. For example, the jury heard testimony that Defendants missed their sales projections by very large spreads.   Trial Tr. vol. 2, 183:7-24, Oct. 18, 2011 (testimony of T. Sayers), ECF No. 154.   The jury saw evidence that before the joint venture was entered, Defendants planned that if the joint venture "los[t] steam," Defendants "would simply walk away."   Pl.'s Trial Ex.

14

64, Email from R. Annas to L. Tilton, May 26, 2006.  The jury
also saw evidence that Defendants stockpiled their own denim
inventory prior to the joint venture transaction and then
"flooded" the market with lower cost denim while the joint
venture was trying to sell its own denim.  Pl.'s Trial Ex. 91,
Email from G. Bird to E. Ricci, Oct. 9, 2008.  From this, a
juror could reasonably conclude that Defendants did not intend
to follow through on promises to sell the joint venture's denim.
For all of these reasons, the Court declines to disturb the
jury's conclusion that Holdings reasonably relied on a
misrepresentation by Defendants.  Accordingly, Defendants'
Motion for Judgment as a Matter of Law is denied as to
Plaintiff's fraudulent inducement claim.

     B.   Plaintiff's Fiduciary Duty Claim

     At trial, the Court found that Plaintiff's fiduciary duty
claim against Defendant Swift Textiles, LLC ("Swift") arose from
the Agreements establishing the joint venture.  Therefore, the
jury was instructed that if it found in Plaintiff's favor on the
fraudulent inducement rescission claim, the jury should not
consider the fiduciary duty claim because that claim would not
exist if the Agreements giving rise to it were rescinded.
Consistent with the Court's instructions, the jury, upon finding
in Plaintiff's favor on the rescission claim, never considered
the fiduciary duty claim.  Nevertheless, Defendant Swift

Textiles LLC ("Swift") has renewed its motion for judgment as a matter of law on that claim, presumably to avoid a remand to this Court if the Court of Appeals finds in Defendants' favor on the fraudulent inducement rescission claim.

Plaintiff's breach of fiduciary duty claim against Swift was based on its contention that Swift was a co-managing member of the limited liability company, Denim North America, LLC ("DNA"), which was owned jointly by Holdings and Swift. Holdings maintained that as a managing member, Swift violated its fiduciary duty under Georgia law when it sold denim products in competition with its fellow member of DNA, Holdings. Swift argues that there was no evidence that Swift exercised managerial control over DNA such that it would be considered a manager of DNA owing a fiduciary duty to Holdings under Georgia law. Swift also argues that even if it owed some fiduciary duty to Holdings, that no evidence was presented from which a jury could determine Plaintiff's alleged lost profits without speculation. Finally, Swift contends that it could not have breached any fiduciary duty because Swift's denim sales were disclosed to Holdings.

Swift made these same arguments in its motion for summary judgment prior to trial, which the Court rejected. The record at trial is at least as strong as the record at summary judgment upon which the Court made its earlier rulings. For the same

16

reasons the Court previously found genuine fact disputes as to whether Swift was a managing member of DNA and whether Swift did in fact disclose the amount of denim inventory it had on hand as of the date of the closing, *Denim N. Am. Holdings, LLC,* 2011 WL 3962278, at *16, the Court concludes that the evidence presented at trial was sufficient for a jury to find in Plaintiff's favor on these issues.   The Court also finds that Holdings presented sufficient evidence at trial to create a jury question on the issue of damages.   For all of these reasons, Swift is not entitled to judgment as a matter of law on Plaintiff's fiduciary duty claim.   Therefore, if the Court of Appeals were to find in favor of Defendants on Plaintiff's fraudulent inducement rescission claim, the Court submits that the case should be remanded for the trial of Plaintiff's breach of fiduciary duty claim against Swift.

## II.  Plaintiff's Remedy

Before the Court submitted the case to the jury, the Court determined that if the jury found that the agreements should be rescinded, it would be necessary for the Court (and not the jury) to use its equitable powers to fashion the precise remedy necessary to place the parties in the position they occupied immediately before they executed the agreements that created the business venture.   The parties agreed with this determination. Having reviewed the parties' post-trial briefs and based on the

17

evidence presented at trial, the Court makes the following Findings of Fact and Conclusions of Law in support of the equitable relief that it orders to accomplish the rescission authorized by the jury's verdict.[3]

A.   Findings of Fact

Before the execution of the Subscription Agreement and Operating Agreement, Holdings owned 100% of Denim North America, LLC ("DNA").  DNA manufactured denim textile products at a plant on Marubeni Drive in Columbus, Georgia.  DNA sold denim products to customers throughout the United States and used Tsudakoma looms to produce its denim.

Swift is the denim manufacturing division of Galey & Lord, LLC ("Galey").  Swift has two members: Galey and Lynn Tilton ("Tilton"), the CEO of Patriarch Partners, LLC ("Patriarch").  Galey was purchased with investment funds managed by Patriarch.  Tilton is the sole member of Galey.  Before the execution of the Subscription Agreement and Operating Agreement, Defendants owned and/or operated the Swift Boland Plant in Columbus, Georgia.  The Boland Plant manufactured denim textile products that were sold throughout the United States, including premium denim that

---

[3] To the extent that any party has suggested that the Court's findings should be based upon evidence not presented during the trial, the Court rejects that contention.  All parties had the opportunity and obligation to present their case during the trial.  No one sought to re-open the trial record to submit additional evidence, and the purpose of the post-trial briefing was to allow argument regarding the trial record, not supplementation of that evidentiary record.

was sold at prices that were higher on average than the prices for denim produced by DNA.  The Boland Plant used Picanol looms to produce its denim.

On September 1, 2006, Holdings entered into a Subscription Agreement with Swift and Galey, and on September 20, 2006, Holdings entered into an Operating Agreement with Swift.  These agreements resulted in the transfer of 50% of Plaintiff's ownership interest in DNA to Swift.  Specifically, the Subscription Agreement provided that Swift would be admitted as a member of DNA, with 50% of the membership interests in DNA, that Holdings would retain 50% of the membership interests in DNA, and that Galey owned 100% of the membership interests in Swift.  The Operating Agreement provided that the two members of DNA were Holdings and Swift; each member had a 50% interest in DNA.

In exchange for the 50% ownership interest in DNA, Defendants paid no cash to Holdings.  Instead, Defendants agreed to contribute its Picanol looms, which the parties valued at $2,350,000 in a term sheet.  Defendants also received two deemed contributions: a mix enhancement for their ability to bring higher-end customers to DNA and a volume enhancement for the additional volume of sales Defendants would bring to DNA.  In a term sheet, the parties valued the mix enhancement at $2,880,000 and the volume enhancement at $1,950,000.  Holdings contributed

DNA's balance sheet, which the parties valued at $4,045,000 in the term sheet.  Holdings also received a deemed contribution, which the parties valued at $1,200,000, for its ability to manufacture denim at a lower cost.

After the transaction closed, the Picanol looms were gradually installed in DNA's facility, and the Tsudakoma looms were gradually removed.  DNA spent $857,500 to install the looms and spent an additional $142,500 on equipment that was necessary to make the looms run.  DNA also hired new employees and trained all of its manufacturing employees to run the looms, at a cost of $507,559.  Based on the trial record, it is not possible to determine what portion of these costs DNA paid with funds DNA earned prior to the joint venture and what portion DNA paid with joint venture earnings.  DNA sold its Tsudakoma looms and paid the proceeds, $857,500, to Swift.  At some point during the joint venture, DNA paid a dividend to Swift in the amount of $801,500.  In 2009, Holdings and Defendants each made a capital contribution of $750,000 in cash.

B.  Conclusions of Law

In determining the appropriate rescission remedy, the Court is mindful of the jury's findings.  The jury's findings support the conclusion that Defendants fraudulently induced Holdings to enter the Agreements and the resulting joint venture by making misrepresentations regarding the contributions that they were

20

making to the transaction.   The jury specifically found that this fraudulent inducement authorized the rescission of the Agreements.   Therefore, the Court hereby orders that the Subscription Agreement and Operating Agreement are rescinded and the joint venture established by them is terminated.   The Court must next decide how to place the parties in the same position they occupied prior to their entry into the agreements.

First, it is undisputed that prior to the parties' joint venture, Holdings owned 100% of DNA.   Therefore, that ownership shall be restored, and Defendants shall execute the necessary documents to transfer their ownership in DNA to Holdings.

The remaining, and perhaps more difficult, question is what, if any, monetary restitution is required to restore the parties to their pre-joint venture positions in an equitable manner.   As previously noted, the appropriate remedy for rescission is to restore the parties to the position they occupied immediately prior to their entry into the contracts that have been rescinded.   *E.g., Brown v. Techdata Corp.*, 238 Ga. 622, 630, 234 S.E.2d at 787, 793.   In other words, Holdings is entitled "to recover what it put into the transaction minus what it gained in the transaction that cannot be returned to Swift." *Denim N. Am. Holdings, LLC v. Swift Textiles, LLC*, No. 4:10-CV-45 (CDL), 2011 WL 4738543, at *3 (M.D. Ga. Oct. 6, 2011).

Holdings concedes that Swift is entitled to reimbursement of its $750,000 capital contribution, and Swift concedes that Holdings is entitled to reimbursement of the $857,500 proceeds DNA paid to Swift from the sale of the Tsudakoma looms. They do not agree on any other restitution amounts. Swift contends that it is entitled to the agreed-upon value for the Picanol looms ($2,350,000) and "at least $4.347 million to $8.135 million" for the value of the business it contributed to DNA. On the other hand, Holdings contends that Swift is not entitled to anything more than $857,500 for the Picanol looms, that Holdings is entitled to the costs of transitioning into the joint venture, and that Holdings is entitled to a return of the $801,500 dividend DNA paid to Swift. The Court analyzes what each party contributed to the venture.

### 1.  *What Plaintiff Contributed to the Transaction*

As previously noted, Holdings conveyed a 50% ownership interest in DNA to the joint venture, and the Court has ordered that Holdings shall get this ownership interest back. In addition, Holdings sold the Tsudakoma looms that it owned prior to the joint venture and gave the $857,500 cash proceeds from that sale to Swift. The Court finds that Holdings should recover those proceeds back from Defendants.

Holdings also established that DNA incurred expenses to install the Picanol looms it received from Swift and to train

employees to operate them, and Holdings seeks a credit for these
expenses.   Holdings, however, pointed to no evidence that these
expenses were paid exclusively with pre-venture funds of DNA,
and there is also no evidence of what portion of the expenses
was paid with pre-venture funds as opposed to joint venture
funds.   It would be pure speculation for the Court to assume
that the loom transition took place so early in the joint
venture that the costs were in effect paid out of DNA's balance
sheet and not joint venture earnings, particularly given that
the looms were swapped out eleven at a time so that DNA could
continue producing customer orders and continue generating cash
after the joint venture began.   In other words, the Court cannot
determine from the trial record what percentage of the
transition expenses were contributions by Holdings to the joint
venture as opposed to operational expenses of the joint venture.
The Court finds that expenses (including dividends) paid with
joint venture funds are not a proper item of restitution for
either party.   Without some evidence that the transition costs
were paid with DNA's pre-venture funds, the Court cannot give
Holdings a credit for the transition expenses.

2.   <em>What Defendants Contributed to the Transaction</em>

In addition to a capital contribution of $750,000, Swift
contributed the Picanol looms to the joint venture and received
monetary credits for certain enhancements relating to product

mix and volume which enhancements were represented by Defendants to be valuable to the venture.  Holdings essentially concedes that Defendants are entitled to a credit for the capital contribution.  Holdings disputes whether Defendants are entitled to any additional credits for their contributions to the venture.

DNA still uses the Picanol looms to manufacture denim, and it is not practical or possible for the looms to be returned to Swift.  Therefore, the Court must determine whether Defendants are entitled to any credit for the Picanol looms.  The Court finds that Defendants are entitled to a credit and rejects Holdings argument that no credit is due because it did not need the looms in the first place.  DNA received the Picanol looms and continues to use them; the Court must therefore determine the value of the looms.  Based upon the evidence presented at trial, the only specific value ever placed on the Picanol looms is the value the parties placed on them when they entered into the transaction: $2,350,000.  The Court therefore finds that the value of the Picanol looms for purposes of the Court's equitable remedy is that amount.

Defendants also argue that they contributed and DNA has received "the benefit of Swift's contributed business—Swift's products, Swift's customers, Swift's sales and development staff, and Swift's superior pricing."  Defs.' Resp. to Pl.'s

24

Post Trial Br. 10, ECF No. 149. Defendants focus on the contributions Swift made to sales volume and sales price, and they argue that there are "two ways to quantify the value of the business Swift contributed to the joint venture." *Id.* at 11. First, Defendants contend that the value of Swift's contribution "can be derived from the transaction documents" and that it is entitled to a credit equal to Defendants' two deemed contributions ($2,880,000 mix enhancement and $1,950,000 volume enhancement) minus ten percent. *Id.* at 12-13. As Defendants concede, however, when the jury found that Defendants fraudulently induced Holdings to enter the joint venture, the jury necessarily concluded that Defendants overstated the value of the business they would contribute to DNA. Accordingly, the Court finds that it is inappropriate to rely on the deemed contributions related to product mix and volume enhancements.

Next, Defendants contend that Swift's contribution to the joint venture can be valued at $8.135 million. This number is based on a post-trial declaration from Defendants' counsel. The declaration references DNA's sales records and purports to separate which sales were attributable to Swift and which sales were attributable to DNA/Holdings. The declaration lists "Swift Customers" and contends that the evidence at trial established that the sales to these customers were "directly attributable to Swift's contributions to DNA." Defs.' Resp. to Pl.'s Post Trial

Br. Ex. 1, Holloway Decl. ¶ 3, ECF No. 149-1; Holloway Decl. Ex.
A, DNA Sales to New Customers Chart, ECF No. 149-2 [hereinafter
Sales Chart].   The declaration assumes that all of the sales to
"Swift Customers" in 2007, 2008, 2009, and 2010 are attributable
to Swift.   Holloway Decl. ¶ 5.   The declaration also assumes an
average margin of $0.46 per yard.   *Id.* ¶¶ 6-7.

     The Court finds several problems with the assumptions made
in the declaration.   First, though the declaration states that
the post-2006 sales to all twelve "Swift Customers" were
directly  attributable  to  Swift,  the  evidence  cited  by
Defendants' counsel in support of this assertion does not
actually support it.   The cited testimony only establishes that
Swift was responsible for DNA's business with eight of the
"Swift Customers."   Trial Tr. vol. 3, 128:9-138-14, Oct. 19,
2011 (testimony of M. Galbraith), ECF No. 155 (testifying about
sales to Polo, Lucky, J Brand, Blue Paint, Guess, Armani, Armani
Exchange and Jack Spratt).   The cited testimony does not
establish that Swift was responsible for the top four "Swift
Customers"—Gap, Old Navy, Abercrombie, and Hollister—and the
declaration itself establishes that DNA had significant business
with these customers prior to 2007.   *See* Sales Chart.   It would
be entirely speculative to conclude that sales to these four
customers were attributable to Swift's contributions.   Second,
the declaration assumes an average margin of $0.46 per yard,

even though Defendants pointed to no evidence of the actual cost of producing denim for the "Swift Customers."   Rather, the testimony cited in the declaration states that it is impossible to tell from the sales records how much it cost to manufacture the denim; moreover, the evidence cited in the declaration establishes that the margins for certain customers were "relatively small" because the product was "extremely difficult" to make.   Trial Tr. vol. 3, 131:9-132:1, 136:12-18.   Therefore, it would be sheer speculation for the Court to conclude that the $0.46 margin applies.

Any profit determination and related value of Swift's contribution cannot, however, be based on speculation. Moreover, to the extent that the post-trial declaration constitutes testimony beyond the trial record, it would be inappropriate to consider it.   While some profit may be attributable to Swift, there is not sufficient evidence for the Court to conclude how much value Swift brought to the joint venture based on the trial record and in light of the jury's findings that it misrepresented the purported value of its contributions at the outset of the venture.   The Court does note that the relief it provides today does not disturb any of the profits or dividends received by the parties during the joint venture.   The Court has found that the most equitable and practical way to handle those items is to leave the parties

where they are as to joint venture profit and loss, which is one of the reasons the Court has declined to give Holdings a credit for the $801,500 dividend paid to Swift.

   *3.   Summary of the Rescission Remedy*

   The Subscription Agreement and Operating Agreement are rescinded, and the joint venture created by them is terminated. Holdings is restored as 100% owner of DNA, with 100% of the capital stock.  In terms of restitution, Holdings is entitled to the following credit:

| | |
|---|---|
| Proceeds from Tsudakoma looms | $857,500.00 |
| Total | $857,500.00 |

Defendants are entitled to the following credits:

| | |
|---|---|
| Value of Picanol looms | $2,350,000.00 |
| 2009 Capital Contribution | $750,000.00 |
| Total | $3,100,000.00 |

Accordingly, to restore the parties to the position they occupied immediately prior to their entry into the contracts that have been rescinded, the Court finds that Holdings must pay Defendants the difference: $ 2,242,500.00.

   The Court also finds that any trademarks, patents or other legally protected intellectual property owned by any of the Defendants prior to their entry into the Agreements shall be owned by the respective Defendant, and Plaintiff shall be enjoined from using such intellectual property without express permission by the respective Defendant.

C.   <u>Relief Granted</u>

Based on the foregoing, the Court orders the following relief:

1.   Within 60 days of today's Order, Defendants shall execute any documents necessary to transfer any ownership interest they have in Denim North America, LLC to Denim North America Holdings, LLC.

2.   At the time that Defendants deliver the documents transferring their ownership interest in Denim North America, LLC to Denim North America Holdings, LLC, Denim North America Holdings, LLC shall deliver payment to Defendants in the amount of $2,242,500.00 less the $275,000.00 that Defendants owe Plaintiff for attorney's fees.

CONCLUSION

As discussed above, Defendants' Motion for Judgment as a Matter of Law (ECF No. 148) is denied.   The Subscription Agreement and Operating Agreement are rescinded, and the joint venture created by them is terminated.   The Court awards Holdings 100% ownership of Denim North America, LLC and orders Holdings to pay Defendants the amount necessary to restore the parties to the position they occupied immediately prior to the joint venture: $2,242,500.00.   Plaintiff shall recover its litigation expenses in the amount of $275,000.00.   Otherwise, the parties shall bear their own costs.

Judgment shall be entered as follows: (1) To effectuate the rescission of the Subscription and Operating Agreements, Defendant Swift Textiles, LLC shall convey its 50% ownership

interest in Denim North America, LLC to Plaintiff, Denim North America Holdings, LLC within 60 days of today's Order; (2) any trademarks, patents or other legally protected intellectual property owned by Defendants prior to their entry into the rescinded agreements shall be the property of the respective Defendant and shall not be infringed upon by Plaintiff; (3) Defendants shall recover $1,967,500.00 from Plaintiff, which represents the amount of restitution owed to Defendants to restore the parties to the position they occupied immediately prior to their entry into the rescinded agreements less the amount that Defendants owe Plaintiff in attorney's fees pursuant to the jury verdict in Plaintiff's favor on the rescission claim, with this net amount payable at the time that Defendant Swift Textiles, LLC conveys its ownership interest in Denim North America, LLC to Plaintiff; and (4) the parties shall otherwise bear their own costs.

IT IS SO ORDERED, this 8th day of March, 2012.

S/Clay D. Land
_____
CLAY D. LAND
UNITED STATES DISTRICT JUDGE